RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0251p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

BENJAMIN EDWARD HENRY BRADLEY,

*Defendant-Appellant*.

No. 19-5985

───────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:15-cr-00037-2—Aleta Arthur Trauger, District Judge.

Decided and Filed: August 10, 2020

Before: SUTTON, McKEAGUE, and KETHLEDGE, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:** Melissa M. Salinas, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant. Cecil W. VanDevender, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

───────────────

**OPINION**

───────────────

SUTTON, Circuit Judge. Between 2009 and 2015, Benjamin Bradley ran a drug trafficking conspiracy that distributed a lot of opioid pills in Tennessee. After he pleaded guilty to drug trafficking and money laundering charges, the district court sentenced him to 17 years in prison and ordered him to forfeit a million dollars, two cash payments, and five properties. We vacated the forfeiture order in light of *Honeycutt v. United States*, 137 S. Ct. 1626 (2017). On

remand, the court found additional facts and issued a similar forfeiture order requiring Bradley to give up a million dollars, the two cash payments, and four (instead of five) properties. Bradley challenges that order on statutory, factual, and constitutional grounds. We affirm.

I.

Between 2009 and 2015, Bradley split his time between working as a medical technician in Detroit and running an opioid trafficking conspiracy. Bradley headed the conspiracy's drug collection efforts in Detroit. Some pills came from people he paid to drive patients to doctor's appointments and after that to pharmacies to collect their prescriptions. Others dropped off hundreds of pills a day at arranged houses on their own.

Donald Buchanan headed up the conspiracy's distribution efforts in Tennessee. To get the pills to Tennessee, Bradley directed coconspirators to pack them into empty candy boxes and glue the boxes closed. At first Bradley mailed the boxes to Tennessee, but later he asked couriers to drive them down.

Drugs flowed south, and cash flowed north. Buchanan paid Bradley for the goods by making deposits into bank accounts Bradley owned or controlled. From 2012 until halfway through 2014, the deposits totaled close to $800,000. Bank deposits stopped in June 2014, when Bradley told Buchanan to pay his couriers in cash.

Bradley pleaded guilty to one count of conspiracy to distribute a controlled substance and one count of conspiracy to launder money. The court sentenced him to 17 years and ordered him to forfeit the proceeds of the crime. On appeal, we affirmed his prison sentence but vacated the forfeiture order because the Supreme Court had ruled in the interim that forfeiture must be based on the defendant's own receipts, not the conspiracy's. *Honeycutt v. United States*, 137 S. Ct. 1626, 1630 (2017). The court held another evidentiary hearing and entered a judgment requiring Bradley to forfeit a million dollars, the cash bundles, and four properties. Bradley appealed.

II.

When a defendant is convicted of certain crimes, a federal statute requires district courts to order forfeiture of "any property constituting, or derived from, any proceeds the [defendant]

obtained as the result of" the crimes, along with "any of the [defendant's] property used, or intended to be used . . . to commit, or to facilitate the commission of," the crime.  21 U.S.C. § 853(a)(1)–(2).  If the defendant no longer has the property, the court "shall order the forfeiture of any other property of the defendant" as a substitute.  *Id.* § 853(p)(1)–(2).

Bradley first argues that § 853 does not authorize money judgments like this one.  But we have already rejected that view.  *United States v. Hampton*, 732 F.3d 687, 691–92 (6th Cir. 2013).  So have several of our sister circuits.  *See, e.g.*, *United States v. Hall*, 434 F.3d 42, 58–60 (1st Cir. 2006); *United States v. Awad*, 598 F.3d 76, 78–79 (2d Cir. 2010); *United States v. Vampire Nation*, 451 F.3d 189, 201–03 (3d Cir. 2006).

Bradley responds that *Honeycutt*, decided in 2017, displaces our 2013 *Hampton* decision and requires the opposite conclusion.  That's so, he says, because *Honeycutt* said § 853 does not expand forfeiture beyond its traditional limits, and forfeiture did not traditionally include money judgments.  But *Honeycutt* acknowledged that § 853 *did* expand traditional forfeiture in some ways.  Forfeiture traditionally proceeded directly against the property rather than the property owner, but § 853 "adopt[ed] an *in personam* aspect to criminal forfeiture."  137 S. Ct. at 1635.  Supporting the point, *Honeycutt* itself addressed the permissible scope of a *money judgment* under § 853.  *Id.* at 1631.  It's hard to maintain that the Court always prohibited what it refined, absentmindedly cutting off the branch it sat on.  *See United States v. Elbeblawy*, 899 F.3d 925, 941 (11th Cir. 2018).

Bradley separately argues that the court did not respect the statute when it calculated the money judgments.  Section 853 requires forfeiture of a crime's "proceeds," and that term, he insists, does not include money received by the defendant from the crime but paid to coconspirators.  But § 853(a) holds defendants responsible for the "proceeds" they "obtained" through the conspiracy, no matter their eventual destination.  Both words, "proceeds" and "obtained," confirm the point.  As we pointed out in an unpublished and well-reasoned opinion, "proceeds" in § 853(a) means gross receipts.  *United States v. Logan*, 542 F. App'x 484, 498 (6th Cir. 2013).  "Proceeds" in isolation, sure enough, might mean gross receipts or profits.  *Id.*  But § 853(a) refers to "profits or other proceeds," indicating "proceeds" means more than just "profits."  It means the gross receipts from the criminal activity.  *Id.*  Other circuits agree.

*United States v. Bucci*, 582 F.3d 108, 123 (1st Cir. 2009); *United States v. Heilman*, 377 F. App'x 157, 211 (3d Cir. 2010); *United States v. Olguin*, 643 F.3d 384, 400 (5th Cir. 2011). No circuit to our knowledge disagrees. So long as "proceeds" means gross receipts, it is beside the point whether the money stayed in Bradley's pocket (e.g., kept as profits) or went toward the costs of running the conspiracy (e.g., used to pay coconspirators).

The second word, "obtained," points in the same direction. Section 853, *Honeycutt* explained, ties forfeiture liability to the proceeds obtained by the defendant—the money or other assets he "c[a]me into possession of" or "g[o]t or acquire[d]." *Honeycutt*, 137 S. Ct. at 1630, 1632–33 (quotation omitted); *United States v. Sexton*, 894 F.3d 787, 798 (6th Cir. 2018). Section 853 asks only whether the defendant obtained the money, not whether he chose to reinvest it in the conspiracy's overhead costs, saved it for a rainy day, or spent it on "wine, women, and song." *United States v. Newman*, 659 F.3d 1235, 1243 (9th Cir. 2011) (quotation omitted).

For today's purposes, that is all we need to say. We do not decide what would happen if forfeiture orders were to exceed the conspiracy's total proceeds, say by ordering both a lower-level conspirator and a mastermind to forfeit the same money. The government did no such thing here.

Bradley separately claims that the district court misjudged the facts. Property is forfeitable under § 853(a) when the defendant used it to commit the crime or it represents the crime's proceeds. Courts presume that property is forfeitable if the government shows that the defendant acquired the property during the offense and there was no other likely source for the property. *See* 21 U.S.C. § 853(d). The district court's forfeiture order covered three categories: a money judgment representing the amount Bradley received from the conspiracy, two bundles of cash found in a search during the investigation, and four properties. Clear error is the test. *United States v. Evers*, 669 F.3d 645, 660 (6th Cir. 2012).

As for the money judgment, the court found that Bradley personally received a million dollars from his drug trafficking scheme. Ample evidence supports the finding. During most of the conspiracy, coconspirator Donald Buchanan paid for the drugs he received by depositing

money into bank accounts Bradley controlled.  He deposited $268,006 in Bradley's and his wife's bank accounts, and he deposited another $530,618 in a bank account held by coconspirator Felicia Jones.  Jones testified that Buchanan deposited the money in her account so that she could give it to Bradley.  Based on bank records alone, that means the forfeiture tally reached close to $800,000.

Bradley later turned to hand deliveries of cash.  Jones picked up cash from Buchanan to deliver it to Bradley about fourteen times, and the record shows that Jones was not the only person carrying cash from Buchanan to Bradley.  Buchanan was arrested on his way to one of his meetings with Jones carrying about $24,000 in cash.  The court estimated that Bradley received just $12,000 from each of 17 meetings for a total of $204,000.  On this record, no clear error haunts the court's finding that Bradley obtained at least a million dollars during the conspiracy.

As to the bundles of cash, DEA officers seized an additional $46,000 or so in cash from Bradley's parents' house and $78,000 or so in cash from Bradley's house.  Recalling that Bradley made between $44,000 and $68,000 a year in his regular job, the court found that Bradley likely had not withdrawn as cash his entire legitimate income for approximately two years, then stored it in his or his parents' house near an assault rifle, a sawed-off shotgun with an obliterated serial number, and several liters of narcotic-laden cough syrup.  No clear error infects the cash finding either.

As to the properties—his home and three other properties—a similar conclusion applies.  The court had no trouble finding that Bradley's home was forfeitable.  Bradley purchased it off the books, paying about $100,000 in scrap gold and gold coins.  He made those payments over 14 months, all during the conspiracy.  During that time, his annual legitimate income was around $68,000.  It's unlikely that Bradley purchased the property with legitimately obtained scrap gold worth more than his regular salary, all while supporting a wife and two children.

The other three properties are a closer call.  But the court did not commit clear error in finding they should be forfeited too.  Bradley purchased all three during the conspiracy, between 2011 and 2012.  They didn't cost Bradley much in real estate terms, just $5,700 total.  Bradley presumably could have afforded that purchase price from his legitimate income.  But he owned a

total of 21 pieces of real estate during the conspiracy, and the court found that added up to a bill Bradley likely could not have footed from his legitimate income. *See United States v. Real Prop. 10338 Marcy Rd. Nw.*, 938 F.3d 802, 811–12 (6th Cir. 2019). That was not clear error.

Bradley counters that he had enough legitimate cashflow to cover the various categories of forfeiture because he received a total of $99,700 from selling some of his investment properties in 2013 and because he earned $90,000 in 2014 from a party-promoting business. But the court did not overlook either income source. It found that neither number changed the picture, because they came too late to make a difference for the three properties purchased in 2011 and 2012. Bradley's tax return, moreover, showed that he made a profit of just $23,529 on the sale of the investment properties. The court used that profit rather than the gross sale price to measure Bradley's ability to save up bundles of cash or purchase his own house. The party-promoting business, notably, operated at a loss, as he spent $92,680 to make $90,465. The court permissibly observed that the business did not increase Bradley's resources.

Bradley adds that the court impermissibly discounted evidence that some of the profits Jones received came from her own dealings with Buchanan outside the conspiracy. But the court accounted for that possibility by ruling out one of Jones's bank accounts that received $56,000 in deposits from Buchanan.

Bradley next lodges a Sixth Amendment challenge, claiming the court had no business finding facts in the first place. "In all criminal prosecutions," the Amendment says, "the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. But no jury right exists in criminal forfeiture proceedings. *Libretti v. United States*, 516 U.S. 29, 49 (1995); *United States v. McAuliffe*, 490 F.3d 526, 540 (6th Cir. 2007).

The Sixth Amendment requires juries to find the facts, other than the fact of a prior conviction, that lead to an increase in the statutory maximum or minimum sentence. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). That rule does not constrain judicial factfinding about aspects of the sentence that lack a determinate statutory maximum or minimum. *United States v. Hall*, 411 F.3d 651, 655 (6th Cir. 2005). Criminal forfeiture is one such indeterminate piece of a sentence. *Id.*; *see also United States v. Fruchter*, 411 F.3d 377, 382–83 (2d Cir. 2005); *United*

*States v. Alamoudi*, 452 F.3d 310, 314–15 (4th Cir. 2006); *United States v. Vera*, 278 F.3d 672, 672–73 (7th Cir. 2002). Unlike a statutory minimum or maximum based on a certain fact—say a fine for every day of a violation—criminal forfeiture requires a defendant to forfeit the property he used in or received from his crime. *Hall*, 411 F.3d at 654–55.

Bradley pushes back on the ground that *Libretti*'s rejection of a jury right was dicta. He points out that the Court took the case to decide "the requisites for waiver of the right to a jury determination of forfeitability under [Criminal] Rule 31(e)." *Libretti*, 516 U.S. at 37. But that does not make its Sixth Amendment conclusion dicta. Before the decision, some circuits held the jury right sprang from the Criminal Rules; others held that it was a constitutional right guaranteed by the Sixth Amendment. *Id.* at 37 n.3. Libretti argued that the right "has both a constitutional and a statutory foundation," such that waiving it in a plea agreement required "specific advice from the district court as to the nature and scope of" the right. *Id.* at 48. The Court disagreed: "Given that the right to a jury determination of forfeitability is merely statutory in origin, we do not accept Libretti's suggestion that the plea agreement must make specific reference to Rule 31(e)." *Id.* at 49.

For these reasons, we have described the statement as a holding. *Hall*, 411 F.3d at 654. So has one circuit after another. *United States v. Carpenter*, 941 F.3d 1, 11–12 (1st Cir. 2019); *United States v. Fruchter*, 411 F.3d 377, 380–82 (2d Cir. 2005); *United States v. Leahy*, 438 F.3d 328, 332 (3d Cir. 2006); *United States v. Day*, 700 F.3d 713, 733 (4th Cir. 2012); *United States v. Simpson*, 741 F.3d 539, 559–60 (5th Cir. 2014); *United States v. Tedder*, 403 F.3d 836, 841 (7th Cir. 2005); *United States v. Sigillito*, 759 F.3d 913, 934–35 (8th Cir. 2014); *United States v. Phillips*, 704 F.3d 754, 769 (9th Cir. 2012); *Elbeblawy*, 899 F.3d, at 941.

Bradley persists that *Libretti* cannot coexist with *Apprendi*. True, *Libretti* preceded *Apprendi*, and its reasoning did not anticipate *Apprendi*'s. But *Apprendi* did not purport to overrule *Libretti*. In situations like this, where an advocate insists a new Supreme Court decision undermines a previous decision, the earlier decision stands until the Court says otherwise. *See Rodriguez de Quijas v. Shearson/American Exp., Inc.*, 490 U.S. 477, 484 (1989). We have already said *Libretti* survived *Apprendi*. *Hall*, 411 F.3d at 654.

Bradley takes a similar tack with our own precedents. He points out that we have not addressed the constitutionality of judge-found facts in criminal forfeiture cases since *Southern Union Co. v. United States*, 567 U.S. 343 (2012). But *Southern Union* dealt with facts that increased the statutory maximum fine a court could impose. *Id.* at 349–50. We have already said it does not undermine our determination that the jury need not find the facts underlying restitution in criminal sentences, since the restitution statute does not specify a maximum. *United States v. Churn*, 800 F.3d 768, 782–83 (6th Cir. 2015). As *Southern Union* reiterated, no *Apprendi* violation exists where no statutory maximum exists. 567 U.S. at 353. *Southern Union* changes nothing about our holdings about the indeterminate criminal forfeiture regime. Here, too, the circuits uniformly agree about *Southern Union*'s impact on criminal forfeiture. *See United States v. Stevenson*, 834 F.3d 80, 86 (2d Cir. 2016); *United States v. Day*, 700 F.3d 713, 733 (4th Cir. 2012); *Simpson*, 741 F.3d at 559–60; *Phillips*, 704 F.3d at 769–70.

Bradley grounds his last argument in the Constitution too. He says the court's forfeiture order violates the Eighth Amendment, which says that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Bradley says the forfeiture judgment is excessive because it will ruin him. Having failed to make the argument below, he must establish plain error. *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc).

No such error occurred. The Supreme Court tells us to evaluate such challenges by asking whether the criminal forfeiture order was "grossly disproportionate to the gravity of [the] defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). We see no mismatch between the offense and the forfeiture order. Bradley committed his crimes on a large scale. The conspiracy lasted for years. It distributed jaw-dropping quantities of opioids. And his criminal profits allowed him to live lavishly despite his modest salary as a medical technician. He rented private jets. He owned a $33,000 Rolex watch and collected 60-plus pairs of expensive shoes. He threw himself a $20,000 birthday party. He spent $11,000 on a single night's entertainment in Las Vegas. The crime paid Bradley very well while it lasted.

Bradley's crimes were not just profitable but deathly serious.  His drug conspiracy fanned the flames of an opioid epidemic that has ravaged communities across America.  The governing statutes recognize that severity by authorizing fines of more than a million dollars and imprisonment for up to 40 years.  18 U.S.C. § 1956(a)(1); 21 U.S.C. § 841(b)(1)(C).  We see no error, let alone plain error, in an order requiring Bradley to forfeit the proceeds of his years at the top of an opioid trafficking conspiracy.

Bradley offers no authority, much less clear authority, for his argument that the statute prohibits "financially ruinous" forfeiture orders.  That does not suffice to establish plain error.

However allegedly ruinous this judgment may be as a financial matter, it's worth remembering that the properties and the cash bundles will be credited toward the money judgment.  The record suggests they will add up to about three-fourths of it.  That leaves about a $250,000 debt.  No small sum for sure, but it's not clear that counts as financially ruinous even if it were the standard.

We affirm.