RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0107p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

BRIAN DEWAYNE DARDEN-MOSBY,

*Defendant-Appellant*.

No. 22-2032

Appeal from the United States District Court for the Western District of Michigan at Grand Rapids.
No. 1:20-cr-00190-1—Jane M. Beckering, District Judge.

Argued: May 1, 2024

Decided and Filed: May 13, 2024

Before: COLE, CLAY, and THAPAR, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Alvin L. Keel, THE KEEL LAW FIRM, P.C., Lathrup Village, Michigan, for Appellant. Austin J. Hakes, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Alvin L. Keel, THE KEEL LAW FIRM, P.C., Lathrup Village, Michigan, for Appellant. Austin J. Hakes, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

## OPINION

_____

THAPAR, Circuit Judge. Storing tens of thousands of dollars in a shoebox is seldom a good idea. Dealing drugs illegally never is. Brian Dewayne Darden-Mosby did both, earning himself two federal convictions. What's more, the government seized over a quarter million

dollars from him. Mosby now wants his money back, but most of his arguments don't cash out. We affirm in part and reverse in part.

I.

*The Searches.* As part of a broader investigation, Drug Enforcement Agency (DEA) special agents executed a search warrant for Brian Dewayne Darden-Mosby's house and car. In Mosby's bedroom, agents discovered an unregistered firearm, a money counter, drug ledgers, marijuana, and a backpack containing 13.6 grams of cocaine. Agents also seized $112,690 in cash found on top of Mosby's dresser, stashed away in the dresser drawers, in a shoebox, and in a bedroom safe. Nala, a DEA canine, detected narcotics residue on the money in the safe and shoebox, but not the money in and on the dresser.

After the search, police pulled over one of Mosby's cocaine suppliers, only to find Mosby in the passenger seat. In Mosby's pockets, a detective discovered a bank envelope containing $2,500 in cash and two cashier's checks totaling nearly $150,000. The detective seized the envelope and handed it to a DEA agent who had arrived on scene.

*Mosby's Criminal Proceedings*. The United States prosecuted Mosby for various crimes based on the drugs and guns found in his house. As part of the prosecution, the government initiated criminal-forfeiture proceedings against the cash from Mosby's bedroom, the two cashier's checks, and the $2,500 found in Mosby's pocket. *See* 21 U.S.C. § 853(a).

Before trial, Mosby sought to suppress the cashier's checks and $2,500, arguing the detective's search violated the Fourth Amendment. The district court denied the motion. *United States v. Darden-Mosby*, No. 20-CR-00190, 2022 WL 593584 (JMB) (W.D. Mich. Feb. 28, 2022). But the government ultimately opted not to introduce that evidence at trial, and it dismissed the criminal forfeiture claims against the two checks. Mosby then motioned for the return of those checks. The court denied that motion because the checks were still subject to DEA administrative proceedings. *United States v. Darden-Mosby*, No. 20-CR-00190 (JMB), 2022 WL 3273550 (W.D. Mich. Aug. 9, 2022).

A jury convicted Mosby of two drug-dealing offenses. Then came the forfeiture phase of the trial. At this point, the government declined to prosecute the forfeiture of the $2,500 in cash from the traffic stop any further. But it continued to pursue criminal forfeiture of the $112,690 from Mosby's house. After a hearing and additional briefing, the court concluded the cash was connected to Mosby's drug dealing. So it ordered the criminal forfeiture of the money. *United States v. Darden-Mosby*, No. 20-CR-00190 (JMB), 2022 WL 3444007 (W.D. Mich. Aug. 16, 2022).

*Mosby's DEA Proceedings*. Separate from the government's criminal-forfeiture actions, the DEA commenced administrative-forfeiture proceedings against the two cashier's checks and the $2,500. *See* 21 U.S.C. § 881. These proceedings resulted in the administrative forfeiture of all three assets.

## II.

Mosby appeals, asking us to order the return of (A) a portion of the $112,690 seized at his house and (B) the two cashier's checks and $2,500 seized during the traffic stop. We review de novo the district court's legal conclusions. *United States v. Salti*, 579 F.3d 656, 667 (6th Cir. 2009). That includes its conclusion that there was enough evidence to support forfeiture. *Id*. We review its factual findings for clear error. *Id.*

## A.

Start with the cash seized at Mosby's house. Mosby must forfeit the money if the government can connect it to his crimes by a preponderance of the evidence.[1] Fed. R. Crim. P. 32.2(b)(1)(A); 21 U.S.C. § 853(a); *United States v. Monsanto*, 491 U.S. 600, 607 (1989) (noting forfeiture is mandatory). In making this showing, the government may rely on any "relevant and reliable" evidence. Fed. R. Crim. P. 32.2(b)(1)(B). Mosby can counter with evidence of his own to show the government can't prove the money had illegitimate sources or uses. *Cf. United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 662 (6th Cir. 2003). Here, the

---

[1]Different statutes govern civil and criminal forfeitures of drug-related assets, and criminal forfeiture requires a nexus with the offense of conviction. But the burden of proof—a preponderance of evidence—is the same in both contexts. *See* Fed. R. Crim. P. 32.2(b)(1)(A); 18 U.S.C. § 983. Thus, civil-forfeiture caselaw informs our discussion of Mosby's criminal forfeitures.

government did not meet its burden as to the $20,220 found in and on the dresser.  But it did for the money found in the safe and the shoebox.

1.

We begin with the government's evidence connecting the cash in Mosby's room to his illegal drug activity.  To start, Mosby had just been convicted of drug trafficking.  And at the forfeiture hearing, he admitted to repeatedly buying and selling cocaine and marijuana.  Notably, Mosby testified these drug transactions were always in cash.  And, unlike his legitimate business income, he kept his drug proceeds in cash, never depositing them in the bank.  All this conviction-related evidence weighs heavily in favor of forfeiture:  Mosby's use of cash to buy and sell drugs—and his storage of the proceeds in cash—support the inference that the cash in his room was drug-trafficking money.  *Cf. United States v. $67,220.00 in U.S. Currency*, 957 F.2d 280, 286 (6th Cir. 1992) ("A [defendant's] record of drug activity is a highly probative factor in the forfeiture calculus."); *United States v. $99,990.00 in U.S. Currency*, 69 F. App'x 757, 763 (6th Cir. 2003) (similar).

Mosby's chosen storage method—keeping over $100,000 in rubber-band-wrapped wads of currency—also suggests the cash is drug money.  *See United States v. $110,873.00 in U.S. Currency*, 159 F. App'x 649, 652 (6th Cir. 2005) (citing "an unusually large amount of currency" as evidence in support of forfeiture); *$99,990.00*, 69 F. App'x at 763.  Bulk currency is more likely to be stolen or lost, but less likely to be discovered by the government.  That's why our court often infers that individuals possessing large amounts of cash are drug traffickers trying to conceal their transactions.  *See, e.g.*, *$67,220.00*, 957 F.2d at 285 (6th Cir. 1992); *see also United States v. $118,170.00 in U.S. Currency*, 69 F. App'x 714, 717 (6th Cir. 2003) ("[P]ossession of a large amount of cash is strong evidence that the money was furnished or intended to be furnished in return for drugs." (quotation omitted)).  That inference is even stronger here given Mosby's background.  As a small-business owner, Mosby regularly used banks for his legitimate enterprises.  Indeed, he had experience wiring money, depositing large checks, and requesting six-digit cashier's checks.  His familiarity with banking makes it all the more suspicious that he would keep over $100,000 in cash sitting around his bedroom.

Next, police found Mosby's cash near a distribution-level quantity of cocaine, an unregistered firearm, money counters, and a safe. These are indicative of drug-related activity. *Cf. United States v. Bell*, 766 F.3d 634, 637 (6th Cir. 2014) (noting that "a digital scale, drug-packaging materials, and police scanners" in the defendant's home justified a sentencing enhancement for maintaining a premises for the purpose of distributing drugs); *United States v. Johnson*, 737 F.3d 444, 447–48 (6th Cir. 2013) (considering the same sentencing enhancement and observing that "laboratory equipment, scales, guns and ammunition" as well as "large quantities of cash" make it more likely that "the property is being used for the purpose of prohibited drug activities"). And their presence at the scene where the cash was seized suggests the money was related to Mosby's drug dealing. *See, e.g.*, *United States v. Bradley*, 969 F.3d 585, 590 (6th Cir. 2020); *$110,873.00*, 159 F. App'x at 652; *United States v. Cunningham*, 520 F. App'x 413, 415–16 (6th Cir. 2013).

Beyond showing that Mosby dealt drugs using cash, the government also introduced evidence suggesting he did so to the tune of $100,000. Alongside Mosby's cash and trafficking paraphernalia, DEA agents also recovered notebooks containing transaction logs and balance sheets. On one of the pages, Mosby listed the names of his drug customers next to several transaction lines. Mosby admitted these books were drug ledgers and that the itemized transactions represented drug sales. And the running balances across these drug ledgers totaled more than $100,000—consistent with the amount of cash stored nearby.

Our court regularly upholds forfeitures when (1) the government recovers bulk amounts of currency, (2) the purported owner has been convicted of drug crimes, (3) the purported owner's legitimate income is insufficient to explain the large sum of money, and (4) the cash is found near drugs. *See, e.g.*, *$118,170.00*, 69 F. App'x at 716–18. Here, there's even more supporting evidence, including Mosby's testimony that he used cash to deal drugs and the $100,000+ in drug-ledger balances.**[2]** Thus, unless Mosby can show legitimate, equally likely

---

**[2]**Mosby argues the government didn't prove that he obtained the cash within the duration of his crime. But the government need not make that showing to secure a forfeiture. To be sure, the government can create a rebuttable presumption of forfeiture by proving Mosby received the cash during his crime of conviction. 21 U.S.C. § 853(d). Yet the government can secure a criminal forfeiture in other ways. For instance, it can show that Mosby intended to use the money to facilitate his drug-dealing conspiracy. *Id.* § 853(a)(2). As already discussed, the government introduced adequate evidence on this point. *Cf. $118,170.00*, 69 F. App'x at 716–18.

sources and purposes for this cash, the government has met its burden and is entitled to forfeiture.  *See $174,206.00*, 320 F.3d at 662.

2.

In response, Mosby offers various explanations for the $112,690 cash in his room.  He concedes that up to $14,000 of that money came from drugs, but he argues the remaining cash has legitimate sources and uses.  While his evidence sufficiently undercuts the government's case as to the dresser money, it fails to tip the scale for the safe and shoebox cash.

*Dresser Money*.  Mosby offers credible evidence that the $20,220 found on and in the dresser had legal sources and purposes.  Start with the sources.  At the forfeiture hearing, Mosby claimed this money came from his small businesses and various loans.  There's more than a kernel of truth in this argument:  his tax returns show that the year he was arrested, his popcorn business brought in over $60,000 in profits.  Mosby also produced checks and bank statements showing he received tens of thousands in loan and grant money in 2019 and 2020.  More importantly, Mosby offered bank statements indicating he withdrew at least $15,000 in cash— just $5,000 shy of what agents found on the dresser—in the months leading up to the seizure.[3] Given that drug dealers don't usually keep drug money in the bank, these withdrawals were likely legitimate funds.  Additionally, the fact that Nala did *not* alert to the dresser money strongly suggests it hadn't been in close contact with drugs.[4] *United States v. $5,000.00 in U.S. Currency*, 40 F.3d 846, 849 (6th Cir. 1994); *cf. $118,170.00*, 69 F. App'x at 716 ("[C]ourts have been reluctant to rely too heavily upon drug detection dog alerts to contaminated money because of evidence that there is widespread contamination of currency in circulation in certain areas of the country." (citation omitted)).  It's therefore likely that Mosby had at least $15,000 in legitimate cash sitting around his house and that the dresser money was from these legitimate withdrawals.  *Cf. Cunningham*, 520 F. App'x at 415 ("The insufficiency of a claimant's legitimate income . . . as reflected by his tax returns" weighs in favor of forfeiture.).

---

[3]These statements were from Chase Bank, the same bank Mosby used for his popcorn business.

[4]Indeed, Nala's ability to detect narcotics on the safe and shoebox currency (which wasn't stored with drugs) suggests that, if the dresser cash had been near drugs in the recent past, she would've alerted.

Mosby offers a legitimate use for the dresser cash, too.  At trial and in his briefing, he claims it was for home-improvement projects.  The record lends support:  one ledger found near the cash suggests he set aside some of that money to do things like replace sinks and fix bathroom floors.  Similarly, Mosby's handwritten inventory of his cash indicates that $10,600 in the bottom dresser drawer was for "Bathroom renovations."  R. 314, Pg. ID 1720.

The government, for its part, does little to rebut this portion of Mosby's argument.  It doesn't deny that Mosby had legitimate income or that he planned to undertake home-improvement projects.  Rather, the government simply notes Mosby can't concretely tie specific cash withdrawals to specific grants or business deposits.  That's no doubt true—after all, money is fungible.  Here, however, Mosby has produced sufficient circumstantial evidence that the money wasn't drug-related, including:  (1) he had legitimate income sources for the $20,220 cash in the dresser, (2) he withdrew around that much cash from banks in the months before the seizure, (3) the drug dog didn't indicate the presence of drugs on that money, and (4) he had legitimate, record-supported uses for that money.  In light of this conflicting evidence, the government hasn't shown a preponderance of evidence supporting forfeiture of the dresser cash.

*Safe and Shoebox Money.*  By contrast, when it comes to the $92,470 in the safe and shoebox, Mosby's evidence is considerably weaker.  He claims those piles of cash came from a lawsuit and his concert business.  And he alleges he intended to use that cash to book artists for concerts.  Neither argument passes muster.

Start with his claim that the money in question came from a lawsuit.  To be sure, Mosby received over $90,000 in checks between 2018 and 2019 after securing a default judgment against a musician.  He claims he cashed those checks, split the money between the safe and shoebox, and left it there for the next year and a half.  But he offers no corroborating evidence that he cashed the $90,000+ in checks.  Nor does he offer evidence that he withdrew that much cash from the accounts into which he deposited the checks.  Indeed, he provides no bank records, ATM receipts, or ledger entries tying the cash—on which Nala found narcotics residue—to the lawsuit checks.  All he offers for this point is his testimony, which, as we'll discuss shortly, isn't credible.

Any link between the seized funds and Mosby's concert business is similarly lacking. Mosby offers no evidence that his concert business was profitable. To the contrary, concert-related income doesn't appear alongside his other business income in his tax returns. And although Mosby has produced ticket-sale totals and event invoices, those documents don't indicate whether any money was ever paid out to him. Moreover, even if there was evidence of legitimate concert income, Mosby still lacks evidence that he withdrew over $90,000 from the relevant bank accounts. Thus, there's no record evidence connecting Mosby's hypothetical concert income to the safe or shoebox cash.

Without any evidence tying the safe or shoebox cash to a legitimate source, all Mosby can rely on is his testimony at the forfeiture hearing. But Mosby gave inconsistent testimony at the hearing, straining his credibility and further undercutting his proffered explanations for the cash. Early in the hearing, Mosby claimed he was "OCD" with his money. R. 306, Pg. ID 1458–59. According to him, he knew "exactly where [each stack of cash] c[a]me from" and what it was intended for. *Id.* And he never mixed cash from different sources. That's why, says Mosby, he could confidently conclude the safe and shoebox money was neither from nor for drug sales.

But Mosby's subsequent testimony casts doubt on the credibility of his mental accounting. When asked again about the money in his room, Mosby admitted he "honestly [couldn't] say if it was or if it wasn't" from marijuana sales. *Id.* at Pg. ID 1481. Nor could Mosby recall the relative amounts he made from selling cocaine and marijuana. Mosby similarly equivocated on where the shoebox money originated. At one point during the hearing, he claimed it was lawsuit money. At another, he claimed it was seed money from when he started his concert business. Likewise with the safe money: earlier, he claimed it came from his lawsuit. But on appeal, he claims it is "directly associated with his concert success." Appellant Br. 16. Though Mosby said he meticulously tracked his money, he was curiously imprecise when it came to the sources of the safe and shoebox cash. Mosby's testimony therefore fails to undermine the government's evidence that the money came from an illegitimate source.

But even if the government failed to tie the safe or shoebox money to an illegitimate *source*, that would be only half Mosby's battle. That's because his money would still be

forfeitable if it were intended for a drug-related *use*. 21 U.S.C. § 853(a)(2). And Mosby's alleged use for the safe and shoebox money—paying musicians who only take cash—is unsupported. For one, unlike his home-improvement projects, Mosby offers no documentary evidence indicating he intended to use this cash for his concert business. Moreover, the record discredits Mosby's assertion that musicians "only" take cash payments. R. 306, Pg. ID 1453. To be sure, Mosby offers one page of a 2017 contract in which half of the "talent fee" was due in cash. R. 314, Pg. ID 1571. But that same contract belies his allegation that cash was "the only way" to pay a musician. R. 306, Pg. ID 1453. The other half of that same talent fee was payable by certified check, money order, or bank wire. Similarly, one of Mosby's bank statements indicates he booked singer Ella Mai using a wire transfer. And at the forfeiture hearing, Mosby testified he did the same to book the rapper Fetty Wap. Thus, Mosby's own evidence undermines his proffered uses for the cash in the safe and shoebox.

In sum, while Mosby offered one plausible source for the safe and shoebox money (the lawsuit checks), he offers no evidence connecting that income to the cash. And he provides no evidence that he withdrew over $90,000 in cash in the months leading up to his arrest. But even if he could, he doesn't offer a legitimate use for that much cash. Nor does he undermine the government's evidence that he planned to use the money for drug trafficking. Accordingly, the government has satisfied its burden for the forfeiture of the $92,470 found in Mosby's safe and shoebox.

B.

Having addressed the cash from Mosby's room, we turn next to the two checks and $2,500 in cash from the traffic stop. Since these assets were subject to administrative forfeiture, we're unable to assess the merits of Mosby's challenge.

Before Mosby's case went to trial, the United States dismissed the criminal-forfeiture actions involving the checks. And later, the government declined to prosecute criminal forfeiture against the $2,500. As a result, there's no judicial forfeiture order for those assets. *See Darden-Mosby*, 2022 WL 3444007, at *2 n.2. Without such an order, we lack jurisdiction. 28 U.S.C. § 1291; *see also United States v. Dusenbery*, 201 F.3d 763, 767 (6th Cir. 2000).

To be sure, the government still deprived Mosby of these assets. But that was through administrative-forfeiture proceedings with the DEA. And the "exclusive remedy" for an administrative forfeiture is a motion to set aside forfeiture, not a criminal appeal. 18 U.S.C. § 983(e)(5); 21 U.S.C. § 881(b). *But see Dusenbery*, 201 F.3d at 766 n.7 (noting defendants may also raise collateral due-process challenges).

Mosby nonetheless argues this court can order the return of his assets by reversing the district court's denial of his "Motion to Suppress and Return Cashier's Checks . . . and $2,500 in cash." Appellant Br. 21, 28–29. Mosby appears to be referencing one of two orders below: the court's denial of his motion to suppress, or the court's denial of his motion to return the two checks. *See Darden-Mosby*, 2022 WL 593584, at *5; *Darden-Mosby*, 2022 WL 3273550, at *2. But since administrative-forfeiture proceedings have run their course, neither motion can return the checks or $2,500 to his hands.

*Motion to Suppress*. Below, Mosby sought to suppress the checks and $2,500 as fruits of an unconstitutional search. In that motion, he also asked the court to dismiss the criminal-forfeiture actions involving the checks. The district court denied the motion, and Mosby challenges that order here. But Mosby's challenge is moot: the government voluntarily dropped the criminal forfeiture actions involving the checks. And the government didn't introduce the checks or $2,500 into evidence. So a reversal of the court's order wouldn't affect Mosby's conviction. Nor would it impact the DEA's administrative forfeiture of the checks or $2,500 cash. *Cf. United States v. One 1974 Learjet 24D*, 191 F.3d 668, 673 (6th Cir. 1999) ("[E]ven when the initial seizure is found to be illegal, the seized property can still be forfeited." (quotation omitted)), *abrogated on other grounds by* 18 U.S.C. § 983(c)(3).

*Motion to Compel*. Mosby also moved to compel the DEA to return his checks under the Federal Rules of Criminal Procedure.[5] But to challenge an administrative forfeiture, a party must use the applicable statutory scheme—not a motion under the criminal procedure rules. *Shaw v. United States*, 891 F.2d 602, 603 (6th Cir. 1989) ("[A] claimant may not use Rule 41[]

---

[5]Mosby purported to file that motion under Rule 47. But that rule doesn't furnish a substantive basis for a motion. It simply governs the form, timing, and service requirements for motions. *See* Fed. R. Crim. P. 47. We therefore treat Mosby's motion as a Rule 41(g) motion for the return of seized property. *See* Fed. R. Crim. P. 41(g).

to bypass the statutory procedure provided for.").  Thus, the district court correctly denied the motion.

*        *        *

We affirm the district court's criminal-forfeiture order with respect to the $92,470 found in the safe and shoebox at Mosby's house.  But we reverse with respect to the $20,220 found in and on the dresser.