NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0029n.06

Nos. 23-5902/6071

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 22, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| TIMOTHY L. GRUNDY (23-5902); DENNIE A. SMITH (23-6071), | ) | |
| | ) | OPINION |
| Defendants-Appellants. | ) | |

Before: McKEAGUE, GRIFFIN, and LARSEN, Circuit Judges.

GRIFFIN, Circuit Judge.

For their roles in participating in a large-scale methamphetamine-distribution ring in southeastern Kentucky, defendants Dennie Smith and Timothy Grundy pleaded guilty to drug conspiracy and firearms charges. The district court sentenced them to 235 and 217 months in prison, respectively. In this consolidated appeal, Smith challenges the district court's denial of a motion to suppress, and Grundy asserts his sentence is unreasonable. For the following reasons, we affirm.

I.

We begin with defendant Smith's appeal, which raises several issues concerning evidence gathered from his daughter's residence.

A.

On February 16, 2022, law enforcement officials responded to a call at an apartment complex in Somerset, Kentucky. They interviewed a woman walking a dog who identified herself as "Delana Keene." After she left the complex in her white Honda, officers learned she was actually "Autumn Smith" and that she had an outstanding warrant for her arrest. Autumn is defendant Smith's daughter.

Officers went to Autumn's residence to execute the arrest warrant and saw her white Honda in the driveway. A woman named April Adams opened the door. She initially denied knowing Autumn, but after the officers warned her about the consequences for harboring a fugitive and told her that they saw Autumn's white Honda and dog at the house, April gave consent to the officers to enter and search for Autumn. Shortly after entering, officers saw a distribution amount of methamphetamine, cash, and marijuana in a bedroom.

Autumn, hiding in a nearby bathroom, revealed herself and was arrested. She then gave consent to search the house—pertinent here, police searched the back bedroom that had only a dresser; inside that dresser was a laptop-sized safe next to more marijuana. Autumn and April disclaimed knowledge of the safe, combination, and contents. Officers seized the safe and, just as they were about to take her into custody in the police cruiser, Autumn requested to retrieve her car keys from the residence. Officers obliged, but Autumn's request was a ruse: she fled the residence in her car and led police in a high-speed chase.

Although officers logged the safe into evidentiary custody at the local police station after they caught Autumn (in the early hours of February 17, 2022), they did not apply for a search warrant until five days later. Specifically, the officer who seized the safe, Logan Warren, applied for the warrant a few hours into his first shift back on duty—on February 22, 2022. After a state

judge authorized the warrant, officials opened the safe and discovered three handguns, several ounces of methamphetamine, thousands of dollars in cash, and defendant Smith's wallet (which contained his license and other identifying information).

A month later, law enforcement officials received a tip that a suspected drug dealer, Wesley Calhoun, planned to buy methamphetamine from someone in Lexington, Kentucky. Calhoun was to travel with "an unknown subject driver driving a white pickup truck." As it turns out, Smith was the driver, and law enforcement officials discovered just under ten kilograms of methamphetamine in the truck following a traffic stop.

Based on the evidence found in the safe and in his truck, a grand jury indicted Smith on various drug-distribution and firearm counts. After the district court denied Smith's motion to suppress such evidence, Smith pleaded guilty to conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846, and possession of a firearm in furtherance of a drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A), while reserving the right to appeal the denial of his suppression motion. He raises several issues concerning that denial.

B.

"When reviewing a district court's ruling on a motion to suppress, we will reverse findings of fact only if they are clearly erroneous. Legal conclusions as to the existence of probable cause are reviewed de novo. When the district court has denied the motion to suppress, we review all evidence in a light most favorable to the Government." *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) (brackets, internal citations, and quotation marks omitted).

1.

Smith first challenges the officers' warrantless seizure of the safe at Autumn's house. He contends the officers lacked probable cause to seize it, that there existed no exigent circumstances

justifying taking it as they left the house, and that officers unreasonably delayed seeking a search warrant. We cannot agree.

"It is well-settled that police may seize an item based on probable cause in order to secure a search warrant for it." *United States v. Sykes*, 65 F.4th 867, 877–78 (6th Cir. 2023) (citation omitted). Probable cause means a "fair probability" that, based on the totality of the circumstances, evidence of a crime will be found in the place to be searched. *Florida v. Harris*, 568 U.S. 237, 244 (2013) (citation omitted). It is a "flexible," "practical," and "common-sensical" standard, focused on assessing "probabilities in particular factual contexts," *id.* (citations omitted), based on the "objective facts known to the officers at the time of the search," *United States v. Smith*, 510 F.3d 641, 648 (6th Cir. 2007) (citation omitted).

Ample evidence supports the district court's determination that officers lawfully seized the safe. In addition to knowing that both occupants were less than truthful, officers discovered in plain view significant evidence of drug trafficking at the house—cash and distribution amounts of methamphetamine. And on top of that, the safe was hidden in a drawer of a dresser that also had marijuana; the dresser was the only furniture in the room. This evidence more than clears the probable-cause inquiry. *See, e.g.*, *United States v. Alexander*, 954 F.3d 910, 917–18 (6th Cir. 2020); *cf. United States v. Darden-Mosby*, 101 F.4th 465, 469 (6th Cir. 2024) ("[C]ash near a distribution-level quantity of [drugs] . . . and a safe . . . are indicative of drug-related activity.").

In some cases concerning the warrantless seizure of property, we have separately considered whether "exigent circumstances" supported the seizure. *See, e.g.*, *United States v. Saddler*, 498 F. App'x 524, 528 (6th Cir. 2012). Exigent circumstances exist when "there is an urgent need to prevent evidence from being lost or destroyed." *Id.* (citation omitted). Assuming

this consideration applies here, we also agree with the district court that the "totality of the circumstances and the inherent necessities of the situation" objectively demonstrated seizure was appropriate to mitigate the risk of destruction of evidence. *Brooks v. Rothe*, 577 F.3d 701, 708 (6th Cir. 2009) (citation omitted). Again, faced with two deceitful occupants, several indicia of drug trafficking, and the safe being highly "portable," "it was objectively reasonable for the officers to believe that [someone] . . . might remove the evidence from inside the safe, take the safe from the scene, or otherwise tamper with it." *Saddler*, 498 F. App'x at 529. And the officers' interest in preventing the destruction, or worse, the dissemination of illegal narcotics or weapons, outweighs the "individual interest protected by the warrant requirement." *Id.* (citation omitted).

Finally, the slight delay between the safe's warrantless seizure and the procurement of a warrant is of no moment. We evaluate such delays by "balancing the individual's possessory interest in the object seized against the law-enforcement interests justifying the seizure and retention." *Sykes*, 65 F.4th at 878. The five-day delay here "was not due to indecision or lack of diligence," *id.*; rather, Officer Warren promptly processed his affidavit for a search warrant upon returning to duty. With that and the government's significant interests in maintaining custody of the safe "to protect against the loss of important evidence," *id.* at 879, we cannot agree with Smith that his possessory interest in the safe nonetheless means the district court erred in refusing to suppress the evidence gathered from it, *Saddler*, 498 F. App'x at 529 (noting interference with a possessory interest in property is "lesser" than those on privacy or liberty interests).

For these reasons, the district court correctly found no constitutional faults with the officers' warrantless seizure of the safe.

2.

Smith next claims the affidavit attached to the warrant obtained to search the safe did not establish probable cause. We give great deference to an issuing judge's finding of probable cause; we will reverse only if we find no "substantial basis" for it. *United States v. Miller*, 314 F.3d 265, 268–69 (6th Cir. 2002). When determining whether the district court had a substantial basis, we consider the totality of the circumstances instead of examining the warrant affidavit line by line. *United States v. Sanders*, 106 F.4th 455, 463 (6th Cir. 2024) (en banc).

Here, Officer Warren's affidavit outlined the evidence discussed above concerning the safe's seizure:

> On 2/17/2022, Officer served an active warrant on Autumn Smith. . . . Officer was given permission to enter the residence to search for Autumn Smith by April Adams . . . who was residing at the residence. During the search of the residence for Autumn Smith, Officer located a clear baggie inside of a clear pink plastic container which contained approximately 17 grams of methamphetamine in plain view laying on a bed inside of Autumn Smith's bedroom. Officer located Autumn Smith in the bathroom. Autumn Smith was arrested and was read her Miranda Rights. Autumn Smith waived her rights and gave Officer's permission to search the residence.
>
> * * *
>
> Officers conducted a search of the residence after Autumn Smith gave Officers permission. Officers located $134.00 U.S. currency laying on Autumn Smith's bed. Officer also located Marijuana in the far back bed room in a dresser drawer along with a black digital safe that was seized. Due to the amount of Methamphetamine that was found at the residence, this Officer believes that the digital safe may contain more illegal drugs or other illegal instruments to further the distribution of illegal drugs.

This affidavit contains substantial information establishing probable cause to search the safe. As set forth above, drugs and currency in close proximity provide the substantial basis necessary to find probable cause. *See Alexander*, 954 F.3d at 917–18. And even if not, we additionally agree with the district court that the *Leon* good-faith exception to the warrant requirement would independently bar suppression. *See Sanders*, 106 F.4th at 467–70.

3.

Finally, because officers legally seized and then searched the safe, we need not consider Smith's dependent argument that the evidence discovered during the subsequent traffic stop was fruit of the poisonous tree.

4.

For these reasons, we affirm the district court's denial of Smith's motion to suppress evidence.

II.

We now turn to Grundy's appeal. He also worked with Calhoun to traffic methamphetamine. Grundy regularly obtained pounds of the drug from Calhoun, and the district court attributed to Grundy between 5–15 kilograms of methamphetamine mixture for purposes of sentencing. Like Smith, Grundy also pleaded guilty to conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846, and possession of a firearm in furtherance of a drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(A). The district court calculated Grundy's Guidelines range for his drug-conspiracy conviction as 188 to 235 months, and it imposed a below-Guidelines sentence of 175 months on that count, consecutive to a mandatory 60 months for his firearm conviction. Grundy contends his sentence is both procedurally and substantively unreasonable. We disagree.

A.

We review sentences for reasonableness, using an abuse-of-discretion standard. *United States v. Jeross*, 521 F.3d 562, 569 (6th Cir. 2008). "Reasonableness review has both substantive and procedural components." *United States v. Keller*, 498 F.3d 316, 322 (6th Cir. 2007). The procedural component requires us to ensure that the district court: "(1) properly calculated the

applicable advisory Guidelines range; (2) considered the other [18 U.S.C.] § 3553(a) factors as well as . . . arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the particular sentence chosen." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007). In evaluating the procedural reasonableness of a defendant's sentence, "we review the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Angel*, 576 F.3d 318, 320 (6th Cir. 2009). And the substantive component requires us to consider whether a defendant's sentence "is too long" because the district court "placed too much weight on some of the § 3553(a) factors and too little on others." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018). Although a sentence within the Guidelines range is entitled to a presumption of reasonableness, where, as here, the court imposed a below-Guidelines sentence, "simple logic compels the conclusion that . . . defendant's task of persuading us that the more lenient sentence . . . is unreasonably long is even more demanding." *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008).

## B.

Grundy first asserts procedural error by claiming that the district court failed to consider an argument he advanced below concerning his Guidelines range in light of the Sentencing Commission's national data that he says demonstrated the need for a lower sentence. But because defendant failed to object to the district court's alleged lack of consideration of this argument, we review for plain error. *See, e.g.*, *United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004).

We discern no error, plain or otherwise. First, the district court clearly weighed disparity concerns. And second, our caselaw is straightforward concerning a district court's use of national statistics when evaluating disparity issues: "[W]e have never adopted the view that district courts *must* consider national sentencing statistics, whether when entering a within-Guidelines sentence

or one that falls outside the Guidelines range. And to clarify any confusion on the point, we expressly reject imposing such a requirement on district courts." *United States v. Hymes*, 19 F.4th 928, 936 (6th Cir. 2021).

## C.

As for substantive reasonableness, a thorough review of the sentencing transcript reflects that the district court carefully considered the § 3553(a) factors, emphasizing the seriousness of the offense ("it's hard to get much higher on the seriousness scale"), and his having "an adult life full of criminal activity," while acknowledging Grundy's "unspeakable trauma" (being sexually assaulted by adults as a teenager). Although Grundy contends the district court should have afforded more weight to his childhood trauma (as well as some of the other factors he says weigh in his favor), we cannot agree that he has overcome the "heavy burden" to establish the unreasonableness of his below-Guidelines sentence. *United States v. Greco*, 734 F.3d 441, 450 (6th Cir. 2013). That is, nothing in the record demonstrates that the district court gave "an unreasonable amount of weight to any pertinent factor." *United States v. Massey*, 663 F.3d 852, 857 (6th Cir. 2011) (citation omitted).

## III.

For these reasons, we affirm the judgments of the district court.