[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

Nos. 20-13091, 20-14377

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ELIZABETH PETERS YOUNG,

Defendant- Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cr-60157-RAR-1

_____

Before JORDAN, ROSENBAUM, Circuit Judges, and MANASCO,[*] District Judge.

ROSENBAUM, Circuit Judge:

Under the federal Anti-Kickback statute, it's illegal to make or accept payments for referring business that a federal program will reimburse. Among other functions, this law helps ensure that medicine-related decision-makers do not make decisions for financial-enrichment reasons but rather for the patient's benefit.

Here, a jury convicted Defendant Elizabeth Peters Young of conspiring to pay and receive kickbacks from federal reimbursements for medical creams and lotions that the pharmacies she worked with dispensed. As part of Young's sentence, the district court ordered Young to make restitution in the amount of $1.5 million to the federal government, based on the amount of kickbacks Young received. The court also entered a forfeiture judgment against Young in that same amount because it represented the gross proceeds Young controlled during the conspiracy.

Young now challenges her conspiracy conviction, the restitution order, and the forfeiture judgment. She asserts that insufficient evidence supported her conspiracy conviction, that the government did not meet its burden to support the restitution amount,

---

[*] Honorable Anna M. Manasco, United States District Judge for the Northern District of Alabama, sitting by designation.

and that the district court erred in calculating the forfeiture amount.

After careful review of the record and with the benefit of oral argument, we affirm Young's conspiracy conviction. We also affirm the district court's forfeiture judgment as consistent with controlling precedent. But we agree with Young that the district court erred in crafting the restitution order. Because the government did not establish that the amount of loss it experienced as a result of Young's conduct equaled the total amount of kickbacks Young possessed during the conspiracy, we vacate the restitution order and remand for further proceedings consistent with this opinion.

## I.     BACKGROUND

### A.     Factual Background

Young had a career marketing medical products to surgeons. She often spent time in the operating room during surgery in case her surgeon clients needed assistance with the products she sold them, and she developed relationships with her clients.

Around 2012, Young started her own distributorship, Young Surgical, LLC. Young Surgical initially sold devices related to spinal surgeries, as that was Young's area of expertise.

But in early 2015, Young decided to start marketing over-the-counter pain-relieving patches and creams to doctors who treated workers' compensation patients. The patches went by the

brand name Terocin, and the creams went by the brand name Li-doPro.  Terocin and LidoPro were expensive.  So only a few healthcare programs, including the Federal Employees' Compensation Act ("FECA") program, administered by the Department of Labor's Office of Workers' Compensation Programs, would pay for them.  Those programs applied an extremely high rate in reimbursing the pharmacies that provided Terocin and LidoPro.  For instance, a program paid one providing pharmacy $802 for Terocin, even though the product cost the pharmacy only $200, plus $16 in shipping.

Young decided that she would try to sell the patches and creams to Dr. Plas James, one of Young Surgical's clients who owned and operated a practice in Georgia.  So she approached Dr. James's medical assistant and office manager, Desiree de la Cruz.[1]  Young and de la Cruz had been friends for more than fifteen years.  Over the years, Young had helped de la Cruz by buying her food and, on one occasion, even giving her a car.  In February 2015, Young asked de la Cruz to tell Dr. James about Young's new venture selling Terocin and LidoPro.

After meeting with de la Cruz, Young looked for a pharmacy that could provide Terocin and LidoPro.  A Google search led her to a pharmacy in Pompano Beach, Florida, called Drugs4Less.

---

[1] At some point during the events in this case, de la Cruz's name changed to Desiree Mitchell.  To avoid confusion with co-conspirator Tim Mitchell, we refer to her throughout this opinion as Desiree de la Cruz.

Drugs4Less had a surplus of Terocin and LidoPro and had experienced trouble offloading them because of their expense.

Young contacted the owner of Drugs4Less, Dr. Amir Serri, and they entered into a contract under which Young would receive a kickback of 50% of the net profits from the prescriptions she was able to direct to Drugs4Less. Drugs4Less then sent a few samples of Terocin and LidoPro to Dr. James, who agreed to use the products with his patients.

Around the same time, Young hired Tim Mitchell as a sales representative for Young Surgical. Mitchell and de la Cruz were living together then and later married. Before Young hired him, Mitchell had been a cashier and had held some positions as a sales representative, including for Aflac. But he had never worked in the healthcare industry.

Young was not concerned about Mitchell's lack of experience, though. She hired him because of his relationship with de la Cruz, whom Young described as a "unicorn." A "unicorn," for these purposes, is someone who "worked in an office that had access to the doctor [and] had the ability to give everybody that came through a prescription," which was "very, very rare" and "unique." Whether or not it's true that de la Cruz had the ability to "give" every patient a prescription for Terocin and LidoPro, the evidence showed that de la Cruz participated in securing prescriptions for Dr. James's patients. For example, Young said de la Cruz "wr[ote]" "script[s]," and Young sent an email saying, "With all of [de la Cruz's] refills today, we're at nine thousand for the day."

With Mitchell onboard as her sales representative and de la Cruz involved in processing prescriptions for Dr. James, Young implemented her kickback scheme. It worked like this: Dr. James saw patients in Georgia who sought treatment for injuries. He often prescribed pain patches and creams to his patients. And Young made it easy for him to prescribe Terocin and LidoPro, between de la Cruz's presence in Dr. James's office and Young's provision of preprinted prescription pads with the drug names Terocin and LidoPro in large print and the generic form of the drugs in small print underneath.[2]

When Dr. James prescribed Terocin or LidoPro to patients who were eligible for federal workers' compensation, de la Cruz sent those prescriptions to be filled at the Drugs4Less pharmacy, even though it was located in Florida. Drugs4Less then filled the prescriptions, shipped the patches and creams for free to the patients, and sent a bill to the FECA program in the Office of Workers' Compensation Programs. That office reimbursed Drugs4Less at the extremely high rates Terocin and LidoPro supported, and Drugs4Less in turn sent half its profits to Young. Young then sent 20% of her revenue to Mitchell for de la Cruz's services.

The co-conspirators focused on Terocin and LidoPro because of their high reimbursement rates. In an email to her Drugs4Less contact, Young even called "adding [L]ido[P]ro" her

---

[2] The government does not assert that Dr. James was involved in Young's scheme.

"best idea EVER." And in response to an email from Drugs4Less asking about refills on Terocin patches, de la Cruz responded, "Refills for everyone!!!!!!!" But if federal programs denied prescriptions for Terocin or LidoPro, Dr. James's office would not prescribe an alternative treatment, further highlighting that the scheme relied on the high rates Terocin and LidoPro supported.

The scheme was a huge financial success. Just a few months into the venture, Young and Drugs4Less enjoyed their first month with over $100,000 in profits. By the end of August 2015, Young's monthly share of the profits reached $134,952. In total, in the roughly sixteen months between March 2015 and July 2016, Young received $1,228,404 from Drugs4Less based on reimbursements from workers' compensation programs, the vast majority of which came from the FECA program.

Of this, Young sent Mitchell $338,255 as purported compensation for his work as a sales representative. In reality, though, as we've noted, these payments were kickbacks to de la Cruz for sending the prescriptions to Drugs4Less. Indeed, Mitchell testified at trial that he did no work at all in his position as a sales representative for Young Surgical. He merely waited for the checks to come in each month as compensation for de la Cruz's work securing the prescriptions.

The arrangement continued through the summer of 2016. Around that time, Young took a few steps to try to limit the legal exposure from her scheme. First, Young had Mitchell sign a declaration stating that he didn't try to influence Dr. James and that Dr.

James made all the medical decisions. Second, she sent Mitchell emails purporting to seek assurances that de la Cruz was not in a position of authority to award the referral of business (even though that was the reason Young hired Mitchell). Third, she arranged a training opportunity for Mitchell so he would appear to be a bona fide sales representative. And fourth, she asked Dr. Serri to hire Mitchell and herself as employees of Drugs4Less, which she hoped would shield her from liability under the Anti-Kickback Statute.

But Dr. Serri refused to hire Young and Mitchell. So Young terminated the relationship with Drugs4Less and found employment for herself and Mitchell at another pharmacy. Apparently unable to find a cooperating pharmacy in Georgia, where the patients were located, or Florida, where Drugs4Less was, Young completed the Eleventh Circuit trifecta and went with Gateway Pharmaceuticals, a pharmacy in Birmingham, Alabama.

Still, Young continued the same arrangement she had with Mitchell and de la Cruz, with only two differences. First, de la Cruz routed the Terocin and LidoPro prescriptions to Gateway instead of Drugs4Less. And second, because Mitchell was an employee of Gateway, Gateway paid him directly, so Young did not have to pay Mitchell anymore. From September 2016 through December 2018, Gateway paid $298,756 to Young and $209,572 to Mitchell.

All told, during the scheme, the FECA program reimbursed $1,863,649 to Drugs4Less and $1,092,919 to Gateway for Terocin and LidoPro prescriptions. Young received $1,527,160.75 in total

between the two pharmacies, and she passed $338,255 of that to Mitchell.

### B.    Procedural History

A federal grand jury returned an indictment against Young for her role in the kickback scheme.  The Indictment charged Young with one count of conspiracy to pay and receive healthcare kickbacks in connection with the FECA program, in violation of 18 U.S.C. § 371, 42 U.S.C. §§ 1320a-7b(b)(1)(A), and 1320a-7b(b)(2)(A); six counts of receiving healthcare kickbacks in connection with the FECA program, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A); and four counts of paying healthcare kickbacks in connection with the FECA program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A).

Young moved to transfer venue to the Northern District of Georgia, or alternatively, to dismiss based on improper venue.  After a hearing, the district court denied Young's motion with respect to the conspiracy count, the payment counts, and three of the receipt counts, and the court dismissed the three remaining receipt counts.

The surviving counts proceeded to a jury trial.  The government called six witnesses, including Mitchell, as part of its case-in-chief.[3]  Mitchell testified that Young and de la Cruz enjoyed a

---

[3] For their roles in the conspiracy, Mitchell and de la Cruz both pled guilty to one count of conspiracy to receive healthcare kickbacks.  Mitchell was sentenced to 60 months' probation, including 12 months' home detention, and he

longstanding close friendship.  In 2015, Mitchell recounted, de la Cruz told Mitchell that Young had offered them an opportunity to make some money.  So Mitchell and de la Cruz met with Young at a Chick-Fil-A, where Young explained that she wanted Mitchell to "focus on selling" LidoPro and Terocin to Dr. James, de la Cruz's longtime employer.  Mitchell noted that de la Cruz had a "[v]ery close" relationship with Dr. James.

According to Mitchell, he had no knowledge of healthcare products, and Young provided no training or instruction.  Although Mitchell tried to sell LidoPro and Terocin to a couple other doctors, Mitchell said, Young discouraged him from spending his time that way.  And as for Dr. James, Mitchell never "pitch[ed]" him, marketed to him, presented to him on Terocin and LidoPro, or even provided him with samples.  Instead, Mitchell testified, Young relied on de la Cruz's "great relationship" with Dr. James.  Young told Mitchell that "[e]very patient that comes through [Dr. James's office] will get our patches and cream" because of de la Cruz.

As Mitchell recounted his position with Young, de la Cruz did "all the work and [Mitchell] . . . ma[de] extremely good money."  But Young told Mitchell "not to do anything" in exchange for the money.

---

was ordered to forfeit his illicit gains in the amount of $457,586 and pay that same amount in restitution.  De la Cruz was sentenced to 12 months and 1 day of imprisonment, and she was held jointly and severally liable for Mitchell's restitution obligations.

Mitchell explained that de la Cruz was Dr. James's back office manager, so she was able to ensure that all his patients were prescribed LidoPro. According to Mitchell, it was de la Cruz who obtained the prescriptions for Terocin and LidoPro from Dr. James, de la Cruz who sent those prescriptions to the pharmacy, and de la Cruz who handled patient issues. Mitchell noted that ensuring that no patients complained was important because Young told him that "[i]f complaints got back to Dr. . . . James, he would have immediately shut down our operation." Although, by his own testimony, Mitchell did "nothing," he was paid "[a]round 450-something thousand dollars." Mitchell opined that he received payment instead of de la Cruz to avoid having de la Cruz's involvement raise "a red flag that would draw attention."

Mitchell also said that Young directed him to take steps to make the arrangement seem legitimate. For instance, he mentioned that Young instructed him to start his own company solely for the purpose of depositing Young's payments because "it looked better in regards to depositing those kind[s] of checks into a business account [as] opposed to a personal account." Similarly, Mitchell recounted that Young told him to remove de la Cruz's name from certain bank accounts. And when it came to payment, Mitchell testified that on several occasions before he opened the bank account in the name of his own company, Young split Mitchell's payment into two or more checks, so no check totaled $10,000 or more. But after he opened his company's bank account, Young paid him with checks well over $10,000.

For her part, Young also engaged in acts to falsely make her arrangement with Mitchell seem legitimate, Mitchell said. For example, after Mitchell and de la Cruz returned from their honeymoon, Young sent Mitchell an email that said, "Now that you and [de la Cruz] are married, I must assume that there is the potential of co-mingling your personal funds." Yet for more than a year before their marriage, Mitchell testified, Young knew that Mitchell and de la Cruz lived together, had given checks to de la Cruz for Mitchell, and was aware that Mitchell and de la Cruz had already been "co-mingling funds." Still, Young's email continued, "I must, with a reasonable amount of certainty, be sure that [de la Cruz] is not in a position of any authority to award the referral of business," and then quoted the federal anti-kickback statute.

Then, when Young started using Gateway instead of Drugs4Less to provide the products, Mitchell testified, he moved right along with Young. According to Mitchell, "My wife. Everything. The whole organization. Everything[]" moved to Gateway. Young also sent Mitchell a contract with Gateway to sign. Under the contract, Mitchell agreed to work as a marketing representative of Gateway.

But in actuality, Mitchell continued to do nothing. And Cruz continued to refer Dr. James's patients—this time to Gateway.

Mitchell also testified that he had pled guilty to conspiring to violate the anti-kickback law because he "was guilty." According to Mitchell, he conspired with de la Cruz, Young, Drugs4Less, and

Gateway. Mitchell explained that he was testifying against Young in the hope of receiving a reduced sentence.

Besides Mitchell, the government called Vanessa Hernandez, a pharmacy technician at Drugs4Less. Hernandez testified that Dr. Serri sought a way to unload his inventory of Terocin and LidoPro, that de la Cruz was Hernandez's point of contact at Dr. James's office, and that Hernandez kept Young updated on problems with prescriptions. Those issues included instances like when the Office of Workers' Compensation declined to reimburse a particular order.

And when Hernandez found the prescribing physician's signature illegible, she called de la Cruz for verification. On occasion, Hernandez continued, de la Cruz also phoned in prescriptions and approved refills on behalf of Dr. James.

On another note, Hernandez explained that sometimes, an insurer declined to pay for a particular prescription, but it was possible to receive coverage for an equivalent prescription. When the insurer denied payment for LidoPro and Terocin, though, Hernandez said, typically, no one sought an equivalent substitute.

Young testified in her own defense. She claimed that all the payments she received from the pharmacies were legitimate payments for marketing and customer referrals. She also testified that all payments she made to Mitchell were for his legitimate work as a sales representative. Young also called several other witnesses to testify on her behalf, including former supervisors and colleagues who had worked with her.

After a ten-day trial, the jury convicted Young on the conspiracy count and the four counts related to paying kickbacks. The jury acquitted Young on the three remaining counts related to receiving kickbacks.

Young moved to set aside the verdict or conduct a new trial. But the district court denied her motion. The court sentenced Young to 57 months' imprisonment and three years of supervised release.

In connection with Young's sentencing, the government moved for a preliminary criminal forfeiture order under 18 U.S.C. § 982(a)(7). Under that provision, a court can order healthcare defendants to forfeit property "that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." 18 U.S.C. § 982(a)(7). The government sought forfeiture in the amount of $1,527,160.75, which represented the total amount Young received in kickbacks in exchange for referrals of Terocin and LidoPro to Drugs4Less and Gateway.

Young opposed the motion on several grounds, three of which she continues to press on appeal: (1) any money that she transferred to co-conspirators should be excluded from the forfeiture total under the Supreme Court's decision in *Honeycutt v. United States*, 581 U.S. 443 (2017); (2) any money derived from private insurers should be excluded; and (3) the total amount is an excessive fine in violation of the Eighth Amendment.

After a hearing, the district court accepted the government's proposed forfeiture amount. It found Young liable for the gross

proceeds of the conspiracy under *Honeycutt* and ordered forfeiture of the total amount deposited into her account—$1,527,160.75—no matter whether those funds came from government funds or private insurers.

The district court also conducted a separate restitution hearing. The government sought restitution in the amount of $1,527,160.75—the same as the forfeiture amount. Young challenged that proposed amount. She asserted that the government did not prove that any of the reimbursements she received were fraudulent and warranted restitution.

The district court concluded that the value of the kickbacks could serve as the starting point to determine restitution. It also found that the government had sufficiently shown that Young's scheme involved fraud and that Young had not offered evidence to establish that the patches and creams she provided were medically necessary. So the district court ordered restitution for the full amount of the kickbacks, $1,527,160.75.

Young timely appealed the initial judgment and prison sentence. She also appealed the amended judgment, which included the forfeiture and restitution penalties. We consolidated Young's appeals.

## II.    STANDARDS OF REVIEW

We review de novo a defendant's challenge to the sufficiency of the evidence underlying her conviction. *United States v. Dixon*, 901 F.3d 1322, 1335 (11th Cir. 2018). In so doing, we "view

the evidence in the light most favorable to the government and draw all reasonable inferences and credibility choices in favor of the jury's verdict." *Id.* (citation omitted).

As to a restitution order, we rely on three standards of review. First, we examine the legality of the restitution order de novo. *United States v. Robertson*, 493 F.3d 1322, 1330 (11th Cir. 2007). After all, "[a] federal district court has no inherent authority to order restitution, and may do so only as explicitly empowered by statute." *United States v. Valladares*, 544 F.3d 1257, 1269 (11th Cir. 2008) (quoting *United States v. Dickerson*, 370 F.3d 1330, 1335 (11th Cir. 2004)). Second, we review the district court's determination of the restitution value of lost or destroyed property for abuse of discretion. *Id.* And third, we review the factual findings underlying the restitution order for clear error. *Id.*

When assessing a forfeiture order, we review the district court's findings of fact for clear error and its legal conclusions de novo. *United States v. Goldstein*, 989 F.3d 1178, 1202 (11th Cir. 2021).

## III.    DISCUSSION

Our discussion proceeds in three parts. We first assess whether sufficient evidence supported Young's conspiracy conviction. Then, we examine the district court's restitution order and determine whether the court erred in measuring the government's losses from Young's scheme. Finally, we consider whether the district court erred in ordering Young to forfeit the full amount that

Drugs4Less and Gateway deposited into her account, given that she transferred some of that money to co-conspirators.

    A.    *Sufficient evidence supported Young's convictions.*

Young asserts that insufficient evidence supported her conspiracy conviction for two reasons. First, she argues that the government failed to present enough evidence to support a conspiracy involving herself, the Mitchells, and Gateway that ran from August 2016 to December 2018. Second, as to Drugs4Less and Gateway, Young contends that insufficient evidence established that de la Cruz or Mitchell served as a decisionmaker who could refer prescriptions to Drugs4Less or Gateway.

We address her arguments in turn.

    1.    <u>*The jury reasonably concluded that Gateway was involved in the conspiracy.*</u>

Young argues first that the government failed to prove a conspiracy involving the Gateway pharmacy. She acknowledges that the government offered several pieces of evidence on this count: the Office of Worker's Compensation Program's billing data; bank records indicating payments from Gateway to Young and Mitchell; Mitchell's testimony that "everything" moved from Drugs4Less to Gateway after Young stopped using Drugs4Less; and an email from Young to de la Cruz in which Young attached a Gateway prescription pad. Still, Young contends that no direct evidence supports her conviction.

According to Young, the jury could draw only one permissible inference from the evidence the government offered: Gateway received legitimate payments from the Office of Worker's Compensation Programs and then paid Gateway's legitimate employees, Young and Mitchell, money that Young and Mitchell legitimately earned.  Noting that the jury acquitted her on the receipt-of-kickbacks counts, Young reasons that the jury couldn't have found that her role in the conspiracy continued once Gateway became involved because Young was no longer paying Mitchell at that time.

We disagree.  We've observed that "[b]ecause the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements."  *United States v. Watkins*, 42 F.4th 1278, 1285 (11th Cir. 2022) (citation omitted).  Indeed, we've noted that the government may rely entirely on circumstantial evidence to secure a conspiracy conviction.  *See United States v. White*, 663 F.3d 1207, 1214 (11th Cir. 2011) ("Because 'conspiracies are secretive by nature, the existence of an agreement and [defendant's] participation in the conspiracy may be proven entirely from circumstantial evidence.'") (citation omitted).  Here, the circumstantial evidence allowed the jury to permissibly conclude that Young was involved in a conspiracy with Gateway.

First, the government presented Mitchell's testimony that his arrangement with Young largely stayed the same after the core conspirators—Young, de la Cruz, and Mitchell—switched the

underlying pharmacy from Drugs4Less to Gateway. In other words, Mitchell continued to get paid to do essentially nothing, while de la Cruz arranged for the patients to receive prescriptions for Terocin and LidoPro and sent them to, now, Gateway. Second, the Office of Worker's Compensation Programs's financial records further support the conclusion that the Terocin and LidoPro prescription scheme worked in the same way before and after Gateway's involvement, with merely a change in which pharmacy filled the prescription. Third, more than twenty of Dr. James's patients who had received medications from Drugs4Less began receiving shipments from Gateway. Fourth, the email from Young to de la Cruz included a Gateway prescription, which the jury reasonably could have understood to mean that Young and de la Cruz planned to continue their scheme in the same way it had operated with Drugs4Less. It makes no difference for purposes of the conspiracy count that Young no longer paid Mitchell directly because she still facilitated the kickback scheme with her co-conspirators.

Based on the evidence, the jury reasonably could have determined that Young moved the kickback scheme to Gateway because Drugs4Less declined to hire Mitchell and her as full-time employees, so Young made the switch in an effort to maintain the scheme under the guise of legal protection. In short, sufficient evidence allowed the jury to reasonably conclude that the conspiracy continued, even though it ran through a different pharmacy. *See United States v. Richardson*, 532 F.3d 1279, 1286 (11th Cir. 2008) ("A conspiracy is presumed to continue until its objectives have been abandoned or accomplished.").

Young points to defense witnesses' testimony to negate the government's evidence about a continuing conspiracy with Gateway. But at this stage, we must assume that the jury made all credibility choices in the verdict's favor. *United States v. Estrada*, 969 F.3d 1245, 1266 (11th Cir. 2020). And the jury could have determined that the defense witnesses were not credible. So we decline to consider their testimony when evaluating whether the government offered sufficient evidence to convict Young.

2.    *The jury reasonably concluded that de la Cruz was a decisionmaker who could refer prescriptions.*

The Anti-Kickback Statute makes it unlawful to "knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program[.]" 42 U.S.C. § 1320a-7b(b)(2)(A). Young argues that de la Cruz was not a decisionmaker with authority to direct the patients' prescriptions, so Young could not have paid de la Cruz "to induce [her] to refer" the patients for unlawful purposes.

*United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013), forecloses this argument. There, the defendant operated a specialty pharmacy, and he paid a "patient advocate" to direct her clients to fill their prescriptions at the defendant's pharmacy. *Id.* at 1245. The patient advocate generally helped her clients by attending

medical appointments with them, helping with routine life tasks, and assisting in filling prescriptions. *Id.* After law enforcement uncovered the scheme, the defendant argued that his payments to the patient advocate could not violate the Anti-Kickback Statute because the patient advocate was not a doctor, so she couldn't "refer" patients to the defendant's pharmacy. *Id.* at 1254.

We rejected that argument. As we explained, the patient advocate "was effectively responsible for deciding which specialty pharmacy to use for the filling of her . . . patients' prescriptions." *Id.* And "overwhelming evidence" showed that the patient advocate could and did refer clients to the defendant's pharmacy. *Id.* In fact, in *Vernon*, some patients "did not even know which pharmacy filled their prescriptions because they gave control of that decision" to the patient advocate. *Id.* So we said it was "irrelevant" that the advocate herself could not actually prescribe the medication. *Id.*

The same reasoning applies here. Even if de la Cruz could not and did not write or sign the prescriptions herself, she was in a position to ensure that the prescriptions were sent to Drugs4Less and Gateway to be filled. Testimony established that de la Cruz sent the prescriptions to Drugs4Less—and later to Gateway—and the pharmacies then shipped the medications directly to the patients in Georgia. In fact, twenty-three of Dr. James's patients switched from Drugs4Less, a pharmacy in South Florida, to Gateway, a pharmacy in Birmingham, Alabama, because of de la Cruz's control over the referrals. In this way, de la Cruz's role in this

scheme resembled that of the patient advocate in *Vernon*, and it was central to Young's operation.

Young also relies on the Fifth Circuit's decision in *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004). There, the defendants paid a public-relations firm $300 per patient who went to the defendants for home health services as a result of the public-relations firm's outreach efforts to doctors on the defendants' behalf. *Id.* at 479–80. The court reversed the defendants' kickback convictions based on this conduct. *Id.* at 481. It explained that the defendants' payments to the firm "were not made to the relevant decisionmaker as an inducement or kickback for sending patients" to the defendants' company because the recipient lacked authority to act on the doctors' behalf to select the defendants' company. *Id.* at 480.

But *Miles* has no more relevance here than we found it did in *Vernon*—none. *Vernon*, 723 F.3d at 1255. Most importantly— and unlike in *Vernon* (and by analogy, here)—we observed that the public-relations firm "had no relationship with the patients." *Id.* So in making payments to that firm, the defendants did not make payments "*to the relevant decisionmaker.*" *Id.* (quoting *Miles*, 360 F.3d at 480) (emphasis added in *Vernon*). By contrast, the *Vernon* defendants' payments to the patient advocate—and Young's payments to de la Cruz here—were payments to a person who had the ability to determine where patients' prescriptions would be filled. So *Miles* has no application here.

In sum, sufficient evidence supports the jury's conclusion that de la Cruz was a relevant decisionmaker with the ability to direct prescriptions, and that Young paid Mitchell to induce de la Cruz to refer prescriptions to Drugs4Less and Gateway.

B.     *The government did not show loss by a preponderance of the evidence to support a restitution order.*

Young appeals the restitution order because the district court based it wholly on the amount of kickbacks Young received, instead of basing it on any actual loss to FECA. The government rightly concedes that this was error. But it asserts that we should uphold the restitution award, anyway. The government argues that the district court determined that Young engaged in fraud, and that means that, as a matter of fact, the entire kickback amount constituted a loss to FECA. Not only that, the government urges, but the district court's factual determination was not clearly erroneous.

We begin by recognizing that "the purpose of restitution is not to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *United States v. Martin*, 803 F.3d 581, 594 (11th Cir. 2015) (cleaned up). For that reason, "[r]estitution is not designed to punish the defendant." *Id.* at 595. To accomplish restitution's purpose, a court must base the amount of restitution awarded to the victim on the amount of loss that the defendant's conduct "*actually* caused." *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010) (citation omitted). That means that, in a restitution order, the

court must account for any value that a defendant's scheme bestowed on the victim.  *Id.*

Here, the district court did not specify whether it ordered restitution under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, or the Victim Witness Protection Act, 18 U.S.C. § 3663. But the parties agree (and so do we) that, either way, the government bore the burden of showing the amount of loss by a preponderance of the evidence under § 3664(e), which applies to all orders of restitution under Title 18.  *See* § 3664(a).

With these thoughts in mind, we first show why the total amount of kickbacks could not serve as the restitution award here. Then, we explain that the district court's fraud finding did not specify which reimbursements Young fraudulently obtained, so we can't affirm the restitution award on the government's proposed alternative basis.

1.    *The total amount of kickbacks does not represent the loss, if any, that the purported victim suffered here.*

We have previously considered restitution awards in other healthcare cases involving kickbacks.  But as we explain below, the restitution calculation is not one-size-fits-all in kickback cases.  Rather, the victim's actual loss serves as our North Star in assessing the proper amount of restitution based on the facts of each case.

To show what we mean, we begin with *United States v. Vaghela*, 169 F.3d 729 (11th Cir. 1999).  There, the defendant, an office manager for a medical practice, arranged to receive kickbacks from a lab in exchange for sending the practice's lab work

there. *Id.* at 731. The doctors, who weren't involved in the scheme, were the ones who determined what tests were necessary, and the defendant merely selected which lab to send the work to. *Id.* at 736. Ultimately, though, a federal program paid for the lab work. *Id.* at 731. We concluded that the district court erred in setting the defendant's restitution at the full amount that the government program paid the lab. *Id.* at 736. Although both parties agreed that the defendant's conduct had caused the government program a loss, the record included no basis for finding that the lab performed any work that was not medically necessary. *Id.* Rather, the defendant inflicted loss on the federal program by causing the lab to charge higher rates than it otherwise would have (which the federal program then paid), so the lab could cover the kickbacks to the defendant. Because the amount the defendant received in kickbacks was the actual loss the federal program suffered, we said restitution was limited to that amount. *Id.*

*United States v. Liss*, 265 F.3d 1220 (11th Cir. 2001), involved another kickback scheme. There, a lab that conducted medical testing paid doctors kickbacks for referring Medicare patients to the lab. *Id.* at 1224. The lab made a total of $55,371.36 in payments to Dr. Michael Spuza for his referrals, all of which the parties agreed were medically necessary. *Id.* at 1225. The district court ordered Spuza to pay restitution in the full amount of the kickbacks he received from the lab. *Id.* We vacated the restitution order. *Id.* at 1232. We explained that the government had failed to provide evidence that Medicare had suffered any loss because of Spuza's conduct. *Id.* That was so, we reasoned, because all Spuza's referrals

to the lab were medically necessary, and Medicare paid the lab a fixed amount for its tests. *Id.* So no basis existed to conclude that Spuza's actions had caused Medicare to spend money it otherwise would not have spent.

As *Vaghela* and *Liss* show, we must look to the facts of each specific kickback case to determine whether the federal-program-victim incurred any loss and, if so, the appropriate measure of it.

Thus, here, we determine loss by considering whether FECA incurred any costs it otherwise wouldn't have been responsible for in the absence of the kickback scheme. FECA reimbursed Terocin and LidoPro at a fixed rate, unlike the reimbursements in *Vaghela*, which the provider set and we assumed were unlawfully increased to account for kickback payments. Because the reimbursements here involved fixed rates, we must consider whether the government has shown that any or all the products Drugs4Less and Gateway provided because of Young's operation were not medically necessary or otherwise fraudulently imposed a cost on the government.

Relying on *United States v. Bane*, 720 F.3d 818, 878 (11th Cir. 2013), the government contends that it had no burden to show a lack of medical necessity as to the prescriptions supporting the restitution amount. Instead, it argues, Young had to show that the prescriptions at issue were medically necessary to offset their value from the total restitution amount. We disagree.

For starters, as we've mentioned, the legislature unambiguously said that "[t]he burden of demonstrating the amount of the

loss sustained by a victim as a result of the offense" falls squarely "on the attorney for the Government." 18 U.S.C. § 3664(e). And "[t]he preeminent canon of statutory interpretation requires the court to presume that the legislature says in a statute what it means and means in a statute what it says there." *Packard v. Comm'r*, 746 F.3d 1219, 1222 (11th Cir. 2014) (cleaned up). So barring a very good reason not to construe the statute to mean what it says, we must conclude that the government bears the burden of showing loss.

In a kickback case, where fraudulent conduct is not an element (so loss is not already baked into a conviction), showing loss necessarily requires the government to establish that the victim paid for something it otherwise wouldn't have, had the defendant not engaged in her scheme. Here, any losses to FECA must have stemmed from its payments for the LidoPro and Terocin provided to its insureds. But FECA was obligated to pay for medically necessary LidoPro and Terocin. So the mere fact that FECA paid for those treatments does not, in and of itself, show loss to FECA without a corresponding showing that the products FECA paid for were not medically necessary. In other words, on the facts of this case, it is impossible for the government to satisfy its burden to show loss without also establishing that the LidoPro and Terocin that FECA paid for were not medically necessary or were fraudulently obtained.

*Bane* does not give us a reason to ignore the plain text of § 3664(e). To be sure, in *Bane*, we vacated a restitution order and

said that "[o]n remand, [the defendant] must offer evidence about what goods or services he provided that were medically necessary and the value of them to receive an offset [to the loss the government claimed]." 720 F.3d at 828. And we even went a step further to explain, "The defendant bears the burden to prove the value of any medically necessary goods or services he provided that he claims should not be included in the restitution amount." *Id.* at 829 n.10. But *Bane* was a fraud case. And while we concluded that fraud and kickback cases both require a determination of whether the restitution amount excludes medically necessary goods or services, *id.* at 828, fraud and kickback cases necessarily differ from each other when it comes to who bears the burden of proving whether any goods or services were or were not medically necessary.

As we've noted, in fraud cases, a conviction inherently means that the paying victim experienced at least some loss. So if the defendant is convicted, that means the government has already shown loss. For that reason, it makes sense for the restitution amount to initially include the entire amount the victim entities paid related to the fraudulent scheme, and then for the defendant to be able to offset that amount by the value of any goods or services she can prove were medically necessary. But in a kickback case, where fraud is not necessary to a conviction, there's no basis for starting with the entire amount that the victims paid because that amount is not a reliable proxy for actual loss. Rather, under § 3664(e)'s mandate directing that the government bears the burden of demonstrating a victim's loss, the government must establish

that a loss, in fact, occurred at all.  And that requires the government to show either a lack of medical necessity or fraud.

Plus, "[w]e have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010).  And the facts in *Bane* differ in an important way from those at issue here.

In *Bane*, defendant Ben Bane owned and operated companies that provided oxygen for Medicare patients.  720 F.3d at 822.  Medicare required equipment providers to ensure that the oxygen was medically necessary by sending patients to an independent laboratory for pulse oximetry testing.  *Id.*  Instead of complying with that requirement, Bane's companies conducted the testing themselves and falsely told Medicare that they used independent labs.  *Id.* at 822–23.  Although the district court found that 80 to 90 percent of the services Bane provided were medically necessary, its restitution calculations did not distinguish between medically necessary and unnecessary services.  *See id.* at 828.

We vacated that order, explaining that, "[b]ecause the victims who paid for medically necessary oxygen paid no more than they would have if the tests had been performed by an independent entity, the only purpose behind restitution of those amounts would be to punish Bane, which is not a proper basis for a restitution award." *Id.*  On remand, we required Bane to prove medical necessity and the value of goods provided to "receive an offset" from the loss amount.  *Id.*  We explained that Bane was "in the best

position to know the value of the legitimate goods or services provided to his victims." *Id.* at 829 (citation omitted).

That was true in *Bane* because Bane conducted all the oximetry testing through his own companies, which were central to the scheme. Bane's own companies ran the tests that determined the patients' medical need, if any, for oxygen. *Id.* at 822–23. Even the patients had to rely on the test results from Bane's companies to know whether they medically required oxygen. So only Bane and those he controlled had direct access to evidence that could establish whether the oxygen that Bane's companies provided was or was not medically necessary. As a result, to give effect to Congress's directive that restitution must or may (depending on the governing statute) be ordered to cover a victim's loss and to prevent the defendant from avoiding restitution even if he caused a loss, the burden of proving medical necessity had to fall on Bane.

But the driving factual quirk in *Bane*—the government was not in a position, because of the nature of the defendant's conduct, to be able to establish what was and was not medically necessary—is not the case here. Unlike in *Bane*, Young is not the only person who can verify whether prescriptions were medically necessary or not. Rather, the government has access to evidence that allows it to establish whether, and if so, how much of, the LidoPro and Terocin products were not medically necessary—that is, what loss, if any, Young inflicted on FECA.

Among other evidence, first, the government hasn't argued that Dr. James, who purportedly approved all the prescriptions,

20-13091                Opinion of the Court                31

was involved in the scheme. So it could ask Dr. James about the medical necessity of each prescription and the particular brands prescribed.[4] Second, de la Cruz, who was the link between Dr. James and the fulfilling pharmacies, pled guilty. So the government could have sought to obtain evidence from her about the medical necessity of the prescribed items. Third, the government in fact interviewed some of the patients who received the products. Some of them told the government that they continued to receive LidoPro and Terocin refills when they hadn't asked for them and didn't need them. So the government had the means to show that at least some of the LidoPro and Terocin that FECA paid for was not medically necessary.

Despite these resources, the government made no effort to establish how much of the products FECA paid for were not

_____

[4] We do not suggest that the mere fact that Dr. James prescribed LidoPro and Terocin shows that they were medically necessary. As we've noted, "[a] doctor's prescription is not a get-out-of-jail-free card" against allegations of healthcare fraud. *United States v. Grow*, 977 F.3d 1310, 1321 (11th Cir. 2020) (per curiam). Of course, in *Grow* and the cases *Grow* relied on, the record contained evidence that doctors were involved in the scheme and had written dubious prescriptions. *See id.* at 1315 (describing how doctors consulted with patients for as little as three minutes online before prescribing the drugs at issue, and doctors at one of the facilities issued the prescriptions to ninety-seven percent of patients). The record contains no such evidence here. But even so, Dr. James may not have thought that the brands LidoPro and Terocin were medically necessary, for instance. Or he may have been told that a patient asked for a refill when she didn't—or any number of other circumstances that would have satisfied the government's burden to show that payment for LidoPro and Terocin was not medically necessary in at least some cases.

medically necessary.  Instead, it asked for the full amount of kick-back payments Young received—a measure that the government appropriately now recognizes was incorrect for the reasons we've already explained.

Though the government asks us to affirm on the alternative basis that the district court made a finding of fraud, we cannot do that.  True, the district court found that "enough has been shown [by the government] from a fraud perspective to satisfy the [government's burden] under [§] 3664."  But the court made no finding as to whether every prescription resulted from fraud or whether instead, the fraud encompassed only some smaller portion of the prescriptions.  This matters.

The district court relied heavily on *United States v. Grow*, 977 F.3d 1310 (11th Cir. 2020) (per curiam), in making its generalized fraud finding.  But there we were determining whether the government had established sufficient evidence of a conspiracy to commit healthcare fraud; we weren't considering the correct restitution amount.  Not only that, but in *Grow*, the prescriptions at issue were dispensed either without the patient ever having spoken to a doctor or based on clearly pretextual virtual appointments with doctors.  *Id.* at 1314–15, 1321–22.  In other words, the evidence supported the conclusion that every prescription was fraudulent.

That is not the case here.  The government presented no evidence showing that patients whom Dr. James didn't examine received prescriptions.  Nor did it show that Dr. James did not ulti-mately decide whether to prescribe Terocin or LidoPro to some

patients.  Though we appreciate the district court's attention to this issue, we simply have no way on this record to sort out what was or was not medically necessary.

For these reasons, we vacate the restitution award and remand for further proceedings consistent with this opinion.

### C.    *The district court did not err in entering its forfeiture judgment.*

We next address the district court's forfeiture order.  Young presents three challenges to the forfeiture judgment.  First, she argues the forfeiture judgment violates the Supreme Court's decision in *Honeycutt*.  Second, she contends it erroneously requires repayment of money that private healthcare providers disbursed.  Third, Young asserts the forfeiture judgment imposes an unconstitutionally excessive fine.

Before we address each of Young's specific arguments, we take a moment to examine 18 U.S.C. § 982(a)(7), the forfeiture statute at issue here, because it governs our analysis.  Section 982(a)(7) is a criminal-forfeiture statute.  *See* § 982 (titled "Criminal forfeiture"); *see also*, *e.g.*, *United States v. Hasson*, 333 F.3d 1264, 1269 (11th Cir. 2003) (referring to § 982 as providing for "criminal forfeiture"); *United States v. Waked Hatum*, 969 F.3d 1156, 1162 (11th Cir. 2020) (describing forfeiture of property under § 982(a)(1) as "part of the 'historical tradition' of '*in personam*, criminal forfeitures'") (citation omitted).

Criminal "forfeiture focuses on the defendant," in contrast to restitution, which focuses on the victim. *United States v. Moss*, 34 F.4th 1176, 1194 (11th Cir. 2022) (citation omitted). As the Supreme Court has explained, "Forfeitures help to ensure that crime does not pay: They at once punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises." *Kaley v. United States*, 571 U.S. 320, 323 (2014) (citation omitted). In this way, their purpose differs from that of restitution, which, as we've explained, is to make the victim whole.

The criminal-forfeiture statute we must apply here—§ 982(a)(7)—requires the court, "in imposing sentence on a person convicted of a Federal health care offense," to "order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." As the text of this statute conveys, its reach is broad. *See United States v. Gladden*, 78 F.4th 1232, 1251 (11th Cir. 2023); *United States v. Bikundi*, 926 F.3d 761, 792 (D.C. Cir. 2019) (per curiam).

The Supreme Court has noted in construing other statutes that the term "proceeds" can be ambiguous, sometimes referring to "receipts" and others to "profits," depending on the context. *United States v. Santos*, 553 U.S. 507, 513–14 (2008) (plurality opinion); *id.* at 525 (Stevens, J., concurring in the judgment) (recognizing "proceeds" will have different meaning in different contexts). But in § 982(a)(7), the term "proceeds" appears in the phrase "gross proceeds." *See* § 982(a)(7). And that phrase is not ambiguous.

Rather, it has an ordinary meaning. "Gross" means "[u]ndiminished by deduction; entire . . . ." *Gross*, Black's Law Dictionary (11th ed. 2019). So when we look at the phrase in the context of § 982(a)(7), "'[g]ross proceeds traceable to' the fraud include 'the total amount of money brought in through the fraudulent activity, with no costs deducted or set-offs applied.'" *Gladden*, 78 F.4th at 1251 (quoting *Bikundi*, 926 F.3d at 792).

### 1.    The forfeiture judgment does not violate Honeycutt.

Young asserts the district court's forfeiture judgment impermissibly renders Young jointly and severally liable for the money she did not keep for herself but rather directed to co-conspirators. In Young's view, we should reduce the roughly $1.5 million forfeiture order by the amounts she routed to other co-conspirators. For support, Young relies on *Honeycutt*.

In *Honeycutt*, the Court considered whether "a defendant may be held jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." 581 U.S. at 445. There, the defendant, Terry Honeycutt, worked at a store his brother Tony owned. *Id*. The store sold a product that drug producers used in making methamphetamine. *Id*. Police officers informed the brothers of the unlawful use, but the store continued to sell the product. *Id*. at 445–46. A grand jury indicted both brothers, and the government sought forfeiture against each of them for $269,751.98, the brothers' profits from their illicit sales of the product. *Id*. at 446. Although Tony pled guilty and agreed to forfeit $200,000, Terry went to trial. *Id*.

After Terry was convicted, the government sought forfeiture against him for $69,751.98—the amount of profits still outstanding—even though Terry "had no controlling interest in the store," "did not stand to benefit personally" from the conspiracy, and "had not personally received any profits" from the illicit sales. *Id.* (internal quotation marks omitted).

The Supreme Court held that Terry could not be held jointly and severally liable for the total illicit profits that the store earned. As the Court explained, applying joint and several liability to forfeiture "would require that each defendant be held liable for a forfeiture judgment based not only on property that he used in or acquired because of the crime, but also on property obtained by his co-conspirator." *Id.* at 448. Based on the text of the forfeiture statute at issue there, 21 U.S.C. § 853(a), the Court concluded that forfeiture is limited to tainted property, and that allowing joint and several liability on the facts in Terry's case would impermissibly extend forfeiture's reach to untainted property. *Id.* at 449, 454.

Throughout its discussion, the Court analogized to a hypothetical scenario involving a "mastermind" farmer who grows marijuana and recruits a college student to deliver it on campuses for $300 per month. *Id.* at 448. In the Court's example, the farmer earned $3 million from the operation over a year while the student earned $3,600. *Id.* at 448–49. The Court explained that the student could not face a forfeiture judgment for the entire amount of the conspiracy's proceeds—$3 million. *Id.* If the student were ordered to pay that amount, the Court reasoned, $2,996,400 of his liability

"would have no connection whatsoever to [his] participation in the crime and would have to be paid from [his] untainted assets." *Id.* at 449.[5]

We've since said that under *Honeycutt*, "a district court may not hold members of a conspiracy jointly and severally liable for property that one conspirator, but not the other, acquired from the crime." *Waked Hatum*, 969 F.3d at 1163. We've also explained that "*Honeycutt* did not purport to address joint and several forfeiture generally but instead narrowly addressed whether a defendant could be ordered to forfeit property that his co-conspirator alone acquired." *Goldstein*, 989 F.3d at 1203.

Even so, we have not yet applied *Honeycutt* in a case like this one, where one conspirator temporarily controlled all the illicit funds and distributed a portion of them to one of her co-conspirators. In *Goldstein*, for instance, after the defendants' unlawful proceeds were deposited into bank accounts that they could both access and control, we held that each defendant was responsible for the total amount of the proceeds. *Id.* at 1203. And in *United States v. Cingari*, when we analyzed *Honeycutt* under the plain-error standard, we concluded that a married couple who jointly operated a fraudulent business could both be held liable for the full forfeiture

---

[5] *Honeycutt* involved a different forfeiture statute than 18 U.S.C. § 982(a)(7), the one at issue here. But we have held that *Honeycutt* applies to 18 U.S.C. § 982(a)(7). *United States v. Elbeblawy*, 899 F.3d 925, 941 (11th Cir. 2018).

sum because both defendants mutually obtained all the proceeds for their joint benefit.  952 F.3d 1301, 1306 (11th Cir. 2020).

But the fact pattern here does not resemble that of either *Goldstein* or *Cingari*.  Here, Drugs4Less sent Young half the monthly profits from the bills that the Office of Workers' Compensation Programs paid Drugs4Less for providing Terocin and LidoPro.  Then, Young sent 20% of what Drugs4Less sent her to Mitchell, usually within a day of receiving the money from Drugs4Less.  So while Young initially had access to all the money that she and Mitchell received for their roles in the Drugs4Less part of the scheme, Young almost immediately re-routed a portion of that money to Mitchell.

All told, Young's payments to Mitchell equaled $338,255.94.  The record contains no evidence that Young intended to retain access to any of that money.  Rather, she always planned to send Mitchell a 20% share of the profits to compensate de la Cruz for directing Terocin and LidoPro prescriptions from Dr. James's office to Young's desired pharmacies.

Under these circumstances, Young asserts that the government's attempt to require forfeiture of the full amount that Drugs4Less sent her improperly imposes joint-and-several liability for the roughly $338,000 she sent to Mitchell.  In Young's view, under *Honeycutt*, the district court could order her to forfeit only the money she "personally obtained" from the crime, which she argues is limited to the proceeds that came to rest in her possession.

For its part, the government argues that *Honeycutt* does not apply to a leader of a conspiracy, especially one who acquires and uses tainted funds to pay an associate. On the government's reading, Young's control of the illicit money—even temporarily—makes her liable to forfeit the full amount.

Several of our sister circuits have weighed in on this type of fact pattern. The parties direct us to some of them.

Young points to the Sixth Circuit's decision in *United States v. Bradley*, 897 F.3d 779 (6th Cir. 2018) ("*Bradley I*"). But *Bradley* does not help her. Instead, it supports the government's position.

In *Bradley I*, the district court imposed joint and several liability on the defendant, who was one of several co-conspirators, for forfeiture of the conspiracy's full proceeds. *Id.* at 783. After *Honeycutt*, the court reversed because "the evidence sa[id] nothing about whether [the defendant] kept all of this money—an improbable development in an eighteen-member conspiracy." *Id.* In remanding the matter to the district court, the court explained that the forfeiture amount should have reflected "an amount proportionate with the property [the defendant] actually acquired through the conspiracy." *Id.* at 784 (citation omitted). Young apparently reads this language to preclude forfeiture of monies one co-conspirator passes along to another.

But *Bradley*'s second chapter clarified that's not what the Sixth Circuit meant. On remand, upon considering the Sixth Circuit's directive, the district court once again concluded that the defendant had to forfeit the conspiracy's full proceeds. *United States*

*v. Bradley*, 969 F.3d 585, 587 (6th Cir. 2020) ("*Bradley II*"). This time, the Sixth Circuit affirmed. *Id.* As the court explained, the forfeiture statute at issue required defendants to forfeit proceeds, meaning *gross* receipts. *Id.* at 589. So it was "beside the point whether the money stayed in [the defendant's] pocket (e.g., kept as profits) or went toward the costs of running the conspiracy (e.g., used to pay coconspirators)." *Id.* Rather, the court reasoned, the forfeiture statute "asks only whether the defendant obtained the money, not whether he chose to reinvest it in the conspiracy's overhead costs, saved it for a rainy day, or spent it [personally].'" *Id.* at 589 (citation omitted).

The First and Second Circuits have construed *Honeycutt* the same way.

In *Saccoccia v. United States*, for instance, the district court ordered a defendant who distributed a drug cartel's proceeds of $137 million to the cartel's accounts to forfeit that full amount, even though he did not ultimately get to keep that sum. 955 F.3d 171, 173 (1st Cir. 2020).[6] The First Circuit concluded that *Honeycutt* did not preclude that forfeiture order. Rather, the court explained, the defendant "neglect[ed] a critical part of *Honeycutt*'s holding: that

---

[6] *Saccoccia* cites our decision in *United States v. Bane*, 948 F.3d 1290 (11th Cir. 2020), to suggest that we've already addressed whether *Honeycutt* applies in circumstances like those presented here. But we do not read *Bane* quite like the First Circuit did because it did not address forfeiture where a defendant temporarily held funds before distributing them to a co-conspirator, and the posture there was a case on collateral review trying to withstand procedural default. 948 F.3d at 1297–98. So *Bane* does not control our decision here.

20-13091                Opinion of the Court                41

any bar against joint and several co-conspirator liability articulated there applies only to defendants who did not actually possess or control the funds at issue." *Id.* at 175. And there, the defendant "controlled the bank account [from] which the funds at issue flowed and . . . oversaw the distribution of those funds." *Id.*

In *United States v. Tanner*, the Second Circuit reached the same conclusion. 942 F.3d 60, 67–68 (2d Cir. 2019). There, the district court ordered joint and several forfeiture for the defendant and his co-conspirator, even though the defendant did not receive the ultimate benefit of all the money. The Second Circuit upheld the award and said, "*Honeycutt*'s bar against joint and several forfeiture for co-conspirators applies only to co-conspirators who never possessed the tainted proceeds of their crimes." *Id.*

The Ninth Circuit has taken a different approach. In *United States v. Thompson*, 990 F.3d 680 (9th Cir. 2021), three co-conspirators ran a scheme in which $2 million was stolen and deposited into trust accounts that one defendant's attorney controlled. *Id.* at 685. The money was later distributed to the co-conspirators. *Id.* at 685. The court held that, under *Honeycutt*, the defendant who originally controlled all the money could not be ordered to forfeit the full $2 million. *Id.* at 690–91. Instead, the court said, *Honeycutt* limited the forfeiture to the amount that "came to rest with [the defendant] as a result of his crimes." *Id.* at 691.[7]

---

[7] The cases we discuss—*Thompson*, *Saccoccia*, *Tanner*, and the *Bradley* cases— did not all interpret the same forfeiture statute. But just as we've held that

42                    Opinion of the Court                    20-13091

We are more persuaded by the First, Second, and Sixth Circuits.  Four reasons lead us to this conclusion.

First, the text of the statute:  as we've noted, § 982(a)(7) provides that "[t]he court . . . shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, *from gross proceeds traceable to the commission of the [Federal health care] offense*."  (Emphasis added).  Under the plain text of the statute, the $1.5 million Young received directly from Drugs4Less and Young Surgical received indirectly from Gateway "constitutes or is derived, directly or indirectly, from gross proceeds traceable" to Young's offenses.  As the Sixth Circuit has explained, the forfeiture statute here "asks only whether the defendant obtained the money, not whether [s]he chose to reinvest it in the conspiracy's overhead costs, saved it for a rainy day, or spent it [personally]."  *Bradley II*, 969 F.3d at 589 (citation omitted).

Second, we agree with our sister circuits that, based on the hypothetical that *Honeycutt* relied on, *Honeycutt*'s "bar against joint and several forfeiture for co-conspirators applies only to co-conspirators who never possessed the tainted proceeds of their crimes." *Tanner*, 942 F.3d at 67–68.  But Young possessed, and even controlled, the funds from Drugs4Less that she sent to co-conspirators, as well as those funds that she directed Gateway to send to co-conspirators.

_____

*Honeycutt* applies to forfeitures under 982(a)(7), all these cases involved forfeiture statutes that the courts held *Honeycutt* applied to.  For that reason, we find them instructive.

20-13091                Opinion of the Court                43

Third, this reading furthers the penological goal of forfeiture. Using proceeds to further the conspiracy and create more proceeds benefits the organizer and controller of a conspiracy as much as (if not more than) using proceeds to buy a house, a boat, or a car. But the reading Young urges would punish only those defendants who immediately use proceeds for their own enrichment.

Finally, this bright-line rule that the text directs provides clarity to would-be defendants and courts alike. It is also more consistent with the punitive purpose of forfeiture. Drawing the line at whether the proceeds ultimately come to rest with a defendant who initially controlled them—regardless of how long the defendant may have controlled those proceeds—would encourage defendants who know the law is about to catch up with them to avoid forfeiture responsibility by simply transferring proceeds to other less responsible co-conspirators.

For all these reasons, we conclude that the forfeiture judgment holding Young responsible for the proceeds she received in her accounts and then directed to co-conspirators did not violate *Honeycutt*.[8]

---

[8] That said, the government may recover the $1.5 million total only once. So to the extent that Mitchell pays any of it, that amount must be deducted from the amount that Young owes.

2.        *The district court properly included proceeds from private payors in the forfeiture amount.*

Next, Young argues that the district court erred by including monies from private insurance payors within the forfeiture judgment. In Young's view, the district court could order forfeiture of only those amounts she received from Drugs4Less and Gateway that Drugs4Less and Gateway, in turn, obtained from federal healthcare program payments—not those they received from private payors' payments. Our prior precedent forecloses Young's argument.

We have construed § 982(a)(7), the forfeiture statute at issue here, in other cases. And in particular, we have opined on the meaning of the phrase "gross proceeds traceable to the commission of the offense" in that statute. We have interpreted that term to require application of a but-for standard to determine whether "gross proceeds" are "traceable to the commission of the offense." *Gladden*, 78 F.4th at 1250 (citation omitted). This standard "means that if one thing hadn't happened another thing would not have happened." *Moss*, 34 F.4th at 1195. As we've explained, applying the but-for standard requires us "to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Id.* (quoting *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020)).

Our precedent contains some examples of how that standard works in practice. We begin with *Moss*, 34 F.4th 1181. Douglas Moss was a physician who fraudulently billed Medicare and

20-13091                Opinion of the Court                45

Medicaid for visits to nursing-home patients that he never made, that were medically unnecessary, or that didn't involve the complexity of the codes he billed under. *Id.* at 1184. The district court ordered Moss to forfeit the total that Medicare and Medicaid paid him for claims billed under certain billing codes. *Id.* at 1194. That total included some amount for legitimate services Moss actually provided. *Id.* But the district court declined to reduce the total. *Id.* Moss argued that was error. *Id.* We disagreed. *Id.* at 1196.

We approvingly cited the District of Columbia Circuit's decision in *Bikundi* for the proposition that it is appropriate not to reduce the forfeiture amount for legitimate services when "the money obtained from the fraud ha[s] propped up the defendants' legitimate services." *Id.* at 1195 (citing *Bikundi*, 926 F.3d at 793). Taking our lead from *Bikundi*, we said that the but-for standard required us to ask, "[I]f Moss had not committed fraud, would he have been entitled to any proceeds for his legitimate services?" *Id.* at 1195. We answered that question with a resounding "no." *See id.* at 1195–96. As we explained, "[t]he gross proceeds from an improperly billed claim are all traceable to the improper billing, even the portion of proceeds that could have been paid for legitimate services if they had been properly billed." *Id.* at 1196.

And most recently, we applied § 982(a)(7)'s but-for standard in *Gladden*. There, John Gladden worked at a compounding pharmacy, where he and other employees dispensed medically unnecessary high-reimbursement prescriptions, among other methods, to fraudulently increase the pharmacy's revenues. 78 F.4th at 1238.

46                    Opinion of the Court                    20-13091

Under § 982(a)(7), the district court ordered him to forfeit $157,587.33—Gladden's salary while he worked at the compounding pharmacy, minus $10,000 the pharmacy paid him before his employment with it. *Id.* at 1249. On appeal, Gladden argued that his forfeiture judgment should not have exceeded "the amount of loss the government proved the victim[s] suffered when they paid [$31,104] for" fraudulent prescriptions attributed specifically to Gladden. *Id.*; *see also id.* at 1241.

We disagreed. *See id.* at 1250–51. Relying on the but-for standard, we explained that Gladden's salary provided the proper measure of forfeiture. That was the case, we said, "because, in the absence of the conspiracy in which Gladden participated, [the compounding pharmacy] would not have employed and compensated Gladden the way that it did." *Id.* at 1251. So, we reasoned, "Gladden's salary constitutes the gross proceeds traceable to the commission of the offense, because in the absence of Gladden's—and the other conspirators'—conduct, it is unlikely that [the compounding pharmacy] would have been able to continue operations in the manner that it did." *Id.* In other words, "[e]ven if Gladden did participate in some legitimate transactions during his time at [the compounding pharmacy], these transactions were propped up by the illegitimate transactions." *Id.*

Young and our colleague's Dissent attempt to distinguish this line of our precedent. They argue that the defendants there were convicted under a different healthcare statute, 18 U.S.C. § 1347, which covers fraud against any "health care benefit

program," defined to include "private plan[s]," § 24(b).    But 42 U.S.C. § 1320a-7(b), Young's statute of conviction, they point out, covers only "Federal health care programs," and its definition does not include private plans.

Under our precedent, though, that makes no difference.  To be sure, § 1347 can be charged to cover fraud against private plans.  But it can't be charged to cover legitimate healthcare services and conduct.  In other words, § 1347's text does not make it illegal to engage in legitimate healthcare services and conduct and to collect proceeds from it.  Yet in *Moss* and *Gladden*, we said that the phrase "gross proceeds traceable to the commission of the offense," from § 982(a)(7), reached the proceeds of legitimate healthcare services and conduct when they were found to be "traceable to the commission of the offense" because they wouldn't have been obtained but for the offense conduct.

So *Moss* and *Gladden* establish that the same forfeiture statute and text at issue in this case can reach proceeds from legitimate services and conduct, even though § 1347 doesn't criminalize those proceeds and conduct, as long as they are traceable to the offense conduct.

And if legitimate conduct and proceeds that don't independently violate § 1347 can be reached under § 982(a)(7)'s "gross proceeds traceable to the commission of the offense" language, then conduct and proceeds that don't independently violate § 1320a-7(b)—including kickbacks for claims to private payors—can also be reached under § 982(a)(7) if the defendant wouldn't have

obtained those kickbacks but for her offense under § 1320a-7(b). After all, § 982(a)(7)'s statutory phrase "gross proceeds traceable to the commission of the offense" applies with equal force, whether the forfeiture involves proceeds the defendant obtained through violations of § 1347 or § 1320a-7(b).

So Young's and the Dissent's argument that § 1320a-7(b) doesn't itself cover payments from private payors is really an argument with our precedent's interpretation and application of § 982(a)(7)'s phrase "gross proceeds traceable to the commission of the offense."  But because of our prior-precedent rule, *see United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008), we are not free to reinterpret that phrase from § 982(a)(7).

We must then consider whether Young would have acquired the funds in question but for her healthcare offenses.  We turn to the district court's factual findings to answer that question.  Here, the district court found that "the driving force" of the payments "was the government portion of it, not the private pay[o]r portion of it," and that the government kickbacks were "part and parcel of" the entire sum.  Forfeiture Hr'g 30:16–19, 32:21–33:2, ECF No. 235.

Young does not assert that the district court clearly erred in making these findings.  Nor has she suggested any reason why she would have received the funds from private payors but for the healthcare offense.  Rather, she relies on her argument that the but-for standard does not apply to § 1320a-7(b) cases.  But as we've explained, she's mistaken about that.  So we agree with the district

court that the forfeiture judgment properly includes all monies Young obtained from Drugs4Less and Gateway from all payors—whether federal or private.

### 3.          *Young abandoned any Eighth Amendment claim.*

Finally, Young summarily challenges the forfeiture order on the grounds that it exceeded the forfeiture liability authorized by 18 U.S.C. § 982(a)(7) and was therefore an excessive fine under the Eighth Amendment. She included no supporting arguments or authority and did not respond to the government's argument in her reply brief. So she has abandoned this issue. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–82 (11th Cir. 2014).

## IV.     CONCLUSION

For the foregoing reasons, we affirm Young's conviction and the forfeiture judgment against her. We vacate the restitution order and remand for further proceedings on that issue consistent with this opinion.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**

20-13091    JORDAN, J., Concurring in Part, Dissenting in Part    1

JORDAN, Circuit Judge, Concurring in Part and Dissenting in Part:

I join all of the court's opinion except for Part III.C.2, which holds that the district court properly ordered Ms. Young to forfeit proceeds obtained from private health insurers through the payment of kickbacks. In my view, those payments were not proceeds derived from the commission of a federal health care offense and as result they were not subject to forfeiture under 18 U.S.C. § 982(a)(7). It will take some pages, and a somewhat laborious trek through federal statutory definitions and cross-references, to explain my position. So please bear with me.

**I**

Ms. Young was convicted of conspiring to pay and receive healthcare kickbacks in connection with the Federal Employees' Compensation Act program, in violation of 18 U.S.C. § 371 and 42 U.S.C. §§ 1320a-7b(b)(1)(A) & 1320a-7b(b)(2)(A), and of paying healthcare kickbacks in connection with the FECA program, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A). The kickback statute at issue, § 1320a-7b, is entitled "Criminal penalties for acts involving Federal health care programs." The subsection that Ms. Young conspired to violate, and actually violated, makes it illegal for someone to "knowingly and willfully offer[ ] or pay[ ] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service *for*

*which payment may be made in whole or in part under a Federal health care program*[.]"  § 1320a-7b(b)(2)(A) (emphasis added).

A "Federal health care program" is defined as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of Title 5); or (2) any State health care program, as defined in section 1320a-7(h) of this title." § 1320a-7b(f).  A "State health care program," in turn, is defined as "(1) a State plan approved under subchapter XIX[;] (2) any program receiving funds under subchapter V or from an allotment to a State under such subchapter[;] (3) any program receiving funds under division A of subchapter XX or from an allotment to a State under such division[;] or (4) a State child health plan approved under subchapter XXI." § 1320a-7(h).

## II

The applicable forfeiture statute, 18 U.S.C. § 982(a)(7), provides that "[t]he court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offense."  A "Federal health care offense" includes a violation of, or a criminal conspiracy to violate, 42 U.S.C. § 1320a-7b.  *See* 18 U.S.C. § 24(a)(1).

The phrase "gross proceeds" in § 982(a)(7) is qualified by the phrase "traceable to the commission of the offense."  The offense

20-13091    Jᴏʀᴅᴀɴ, J., Concurring in Part, Dissenting in Part    3

here, as incorporated through § 24(a)(1), is a violation of, or a conspiracy to violate, § 1320a-7b. So the gross proceeds that are subject to forfeiture under § 982(a)(7) must be traceable to the violation of (or the conspiracy to violate) § 1320a-7(b).[1]

As we explained in *United States v. Elbeblawy*, 899 F.3d 925, 941 (11th Cir. 2018), § 982(a)(7) "reach[es] only property traceable to the commission" of a covered offense. Under § 982(a)(7), therefore, the government "has the burden to show that the [funds from the private health insurers] were [1] funds directly or indirectly derived from gross proceeds of [Ms. Young's healthcare offenses]; and [2] that the funds were traceable to [those] healthcare offense[s]." *United States v. Ayika*, 837 F.3d 460, 471 (5th Cir. 2016).

Paying kickbacks for the referral of medical services paid by private health insurers may be socially undesirable behavior, and may even transgress applicable state law, but such conduct does not violate § 1320a-7(b), the statute underlying Ms. Young's substantive and conspiracy convictions. The reason is, of course, that private health insurers do not constitute a "Federal health care program" within the meaning of § 1320a-7b(f) or a "State health care program" within the meaning of § 1320a-7(h). *See Shah*, 95 F.4th at 388 (explaining, in a federal kickback case, that "it was the presence

---

[1] I recognize that in certain circumstances private health insurers can be victims in a federal kickback scheme for purposes of restitution under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A(a)(2), (c)(1). *See United States v. Shah*, 95 F.4th 328, 388–89 (5th Cir. 2024). But here we are dealing with forfeiture under § 982(a)(7), and not restitution under the MVRA.

of federal insureds that granted federal jurisdiction in this case and was necessary for conviction"). *See also* Trenton Brown, *Health Care Referrals Out of the Shadows: Recognizing the Looming Threat of the Texas Patient Solicitation Act and Other Illegal Remuneration Statutes*, 49 St. Mary's L.J. 749, 754 (2018) ("Generally, the [federal] Anti-Kickback Statute is implicated when remunerations are solicited, offered, or exchanged for referrals for services or items for which payment may be made, in whole or in part, under a Federal health care program (e.g., Medicare, Medicaid, TriCare)."); Kim C. Stanger, Health Law Handbook No. 6 at § 1.4 (Aug. 2021) (noting that § 1320a-7b is "not available [for use by prosecutors] to the extent the arrangements induced referrals for private pay business").[2]

What is the upshot of all of this? Simple—if paying kickbacks to private health insurers does not violate § 1320a-7(b), then any proceeds that Ms. Young received as a result of such kickbacks are not "gross proceeds traceable to the commission of the offense" for purposes of § 982(a)(7). Those proceeds, therefore, are not subject to forfeiture.

---

[2] A relatively new federal criminal statute, 18 U.S.C. § 220(a), prohibits kickbacks with respect to certain services covered by a "health care benefit program." For purposes of § 220(a), a "health care benefit program" is defined in 18 U.S.C. § 24(b). *See* § 220(e)(3). Because § 24(b)'s definition includes "any public or private plan or contract," § 220(a) is in some ways "broader than [§ 1320a-7b] in that it extends to items or services payable by private payors as well as federal programs." Stanger, Health Law Handbook No. 6 at § 1.3.5. But Ms. Young was not charged with violating § 220(a), so it is not the statute underlying her convictions for purposes of § 982(a)(7).

20-13091    JORDAN, J., Concurring in Part, Dissenting in Part            5

### III

The court holds that Ms. Young must forfeit proceeds obtained from private health insurers due to a trio of Eleventh Circuit cases that apply a "but for" standard under § 982(a)(7). *See United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344 (11th Cir. 2009) (ordering forfeiture of private payor proceeds "because, *but for* [the defendant's] Medicare fraud, she would not have been entitled to collect . . . from companies and patients") (emphasis in original); *United States v. Moss*, 34 F.4th 1176, 1195 (11th Cir. 2022) (ordering forfeiture of proceeds, including for potentially legitimate services, that the defendant would not have earned "but for his Medicare fraud"); *United States v. Gladden*, 78 F.4th 1232, 1251 (11th Cir. 2023) (ordering forfeiture of the defendant's salary because the company would not have generated revenue "but for [its] long-running healthcare fraud conspiracy"). As I try to explain below, I do not think these cases control the analysis or outcome here. Whatever the general validity or propriety of the "but for" standard in other contexts, I do not believe that it should be extended to a case like this one.

According to the court, any textual differences between the statute underlying the convictions in *Hoffman-Vaile*, *Moss*, and *Gladden* and the statute underlying Ms. Young's convictions are inconsequential. I respectfully disagree. The defendants in each of those "but for" cases were convicted in whole or in part of committing health care fraud in violation of 18 U.S.C. § 1347. They were not convicted of paying or receiving kickbacks in violation of § 1320a-7b. *See Hoffman-Vaile*, 568 F.3d at 1339; *Moss*, 34 F.4th at 1184;

*Gladden*, 78 F.4th at 1240. Critically, § 1347 encompasses fraud against "any health care benefit program," a term which "means any public *or private* plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual[.]" 18 U.S.C. § 24(b) (emphasis added). Consequently, any proceeds derived from health care fraud proscribed by §1347—including those proceeds obtained from private health plans—are subject to forfeiture under § 982(a)(7). In contrast, the relevant statute of conviction here, § 1320a-7b, does not prohibit kickbacks for the referral of services paid by private health insurers.

Because § 982(a)(7) targets the "gross proceeds traceable to the commission of the offense," the language of the underlying statute of conviction matters in determining what is forfeitable. In my view it is inappropriate to apply a forfeiture standard developed in cases involving health care fraud under § 1347—which reaches fraud committed against private health plans—to kickback cases under § 1320a-7b—which does not reach kickbacks involving services paid by private health insurers—without a compelling reason to do so. From my perspective, there is no such reason here. We "are not obligated to extend [prior decisions] to different situations." *Anders v. Hometown Mortg. Servs., Inc.*, 346 F.3d 1024, 1031 (11th Cir. 2003). Indeed, "stare decisis doesn't apply to statutory interpretation unless the statute being interpreted is the same one that was interpreted in the earlier case." Brian A. Garner et al., The Law of Judicial Precedent 343 (2016). We should not apply § 982(a)(7) in a way that makes the underlying statute of conviction completely irrelevant.

20-13091    JORDAN, J., Concurring in Part, Dissenting in Part    7

## IV

I would set aside the forfeiture order insofar as it requires Ms. Young to forfeit proceeds obtained from private health insurers. With respect, I dissent from the court's contrary disposition on that score.